BOARD OF PROFESSIONAL RESPON-
SIBILITY OF the SUPREME COURT
OF TENNESSEE, Appellant,

v.

Richard BONNINGTON, Appellee.

Supreme Court of Tennessee,
at Knoxville.

Dec. 5, 1988.

Robert Fellman, Disciplinary Counsel, Nashville, for appellant.

James C. Lee, P.C., Chattanooga, for appellee.

## OPINION

FONES, Justice.

A hearing committee found that Respondent, Richard Bonnington, had misappropriated funds belonging to the estate of Cleo B. Durrah, deceased, and suspended him from the practice of law for a period of four years, conditioning his reinstatement on full restitution of interest, attorney's fees and costs, respondent having returned the principal sums appropriated before discovery of his misdeeds. The Circuit Court of Hamilton County affirmed the judgment of the hearing committee and the Board of Professional Responsibility appealed to this Court, insisting that disbarment is the only appropriate disposition of a misappropriation case such as this.

Respondent, Richard Bonnington, was admitted to the bar in 1975. He began the practice of law in Chattanooga in September 1976. Between September 1976 and

early 1980 he practiced with four different law firms or lawyer groups. He was practicing alone in Red Bank in June 1980, when his lawyer friend, Mitchell Byrd, called him and asked him if he would handle the estate of Cleo B. Durrah. The sole beneficiary of the estate, Albert Sims, of Detroit, Michigan, was in Mr. Byrd's office at that time. Respondent agreed and was duly appointed administrator by the Probate Court of Hamilton County and served as lawyer for the administrator. On 1 April 1981, Joe Harrison, Mitchell Byrd, and respondent began practicing law as partners with the firm name of Harrison, Bonnington and Byrd. Respondent continued to practice with that firm until he voluntarily withdrew from the practice of law in June 1986.

The gross receipts that came into respondent's hands as administrator of the Durrah estate was $28,636.29. That sum included a check for $2,800 given as earnest money on the purchase of the house and lot belonging to the estate that was dishonored by the bank. Thus, the gross estate was actually $25,836.29. The house was eventually sold and respondent received the net proceeds of the sale, $19,640.08 on 15 April 1981. Upon receipt of that sum, respondent had $21,956.82 in the estate bank account. The disbursements he had made included an unauthorized check to himself on 19 August 1980 in the sum of $1,500 that he testified he used to purchase a copy machine.

On 9 June 1981, respondent disbursed $5,003 to Albert Sims, the estate beneficiary. On 26 February 1982, respondent paid himself $9,289.46 out of the estate account. On 1 August 1982, respondent returned that identical sum to the estate account.

Thereafter, respondent wrote unauthorized checks to himself as follows:

(1) 21 December 1982, $1,000;

(2) 14 February 1983, $1,100;

(3) 16 March 1983, $5,000;

(4) 18 May 1983, $3,000.

The only sum brought into the estate after the proceeds of the sale of the house was $262.57, on 11 February 1983, described as "Whitehead—Garnishment Proceeds." On 9 March 1983, respondent made a second partial distribution to Albert Sims of $5,000. It is clear from the record before us that a final accounting should have been filed at that time, a full distribution made to Sims and the estate closed.

The Probate Court of Hamilton County approved the sum of $7,198.05 for respondent's services and expenses as administrator and attorney for the estate. Respondent withdrew that sum from the estate on 31 October 1983.

Respondent reimbursed the estate for the sums he improperly withdrew, as follows:

(1) 1 November 1983, $10,000;

(2) 7 February 1986, $1,600.

At some date near the end of 1985 the Probate Court removed respondent as administrator and appointed Walter Grantham as his successor. The record does not reveal the date respondent learned of his removal but clearly implies that it was prior to 7 February 1986. On that date respondent wrote a check payable to the Durrah Estate, drawn on his law firm's trust account for $1,600. That sum completed the return to the estate of all the principal that he had improperly withdrawn.

On 12 February 1986, respondent filed an accounting in the Probate Court that correctly reflected all of the receipts and disbursements except the six checks to himself totalling $20,889.46 and the three restitution checks totalling that same amount.

Albert Sims called Mitchell Byrd about closing the estate, apparently in early 1986, and that, and other events, led Mr. Byrd to have an accountant audit the firm trust account and the Durrah estate account. The results of that audit were delivered to Mr. Byrd at about the same time that respondent decided to and did reveal to his law partners that he had misappropriated funds from the Durrah estate.

Apparently respondent had theretofore advised the probate judge of the misappropriations. On 11 June 1986, respondent's counsel, James C. Lee, advised the Board of Professional Responsibility that Bon-

nington had made unauthorized borrowings from the Durrah estate while serving as its administrator and attorney and that Bonnington was voluntarily withdrawing from the practice of law.

At the time of the hearings below, respondent was represented by counsel other than Mr. Lee in the proceedings in the probate court to determine the exact amount due the estate. There was testimony in this case that the successor administrator had informally advised respondent that he owed approximately $4,000 interest plus the repayment of the fee allowed in the Durrah estate of approximately $7,000. Respondent acknowledged his indebtedness for those sums and it appears from this record that when respondent's interest in the law firm and some real estate it owns is forthcoming, that that indebtedness to the Durrah estate will be satisfied. We will assume for the purpose of this proceeding that respondent will satisfy the judgment rendered by the probate court, expeditiously. It will be essential that he prove that he has done so as one of the prerequisites to restatement of his license to practice law if and when he makes application.

█ It is appropriate to observe at this point that a suspension of four years from the practice of law is only one year short of the maximum punishment of disbarment from the practice of law. A lawyer suspended for one year or more must apply for reinstatement and go through the same procedure that a disbarred lawyer must do after five years, to-wit: prove by clear and convincing evidence in the established tribunals of the disciplinary system that he or she has the moral qualifications, competency and learning in law required for admission to practice in this State and that his resumption of the practice of law within the State will not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest. *See* Supreme Court Rule 9, § 19.

█ At the hearing before Chancellor Inman, the attorney for the Board stated that no new evidence would be presented because "both sides basically accept the findings of fact" of the hearing panel. Thereafter, he observed that the Board's only disagreement with the hearing panel was its finding that respondent's admission of guilt was voluntary. The Board's contention before the chancellor and in this Court is that the time has arrived to promulgate a hard and fast rule that all misappropriations of funds by lawyers should result in disbarment, unless the lawyer is shown to be under a disability that negates the *mens rea* at the time of the taking. In short, the Board says that the only mitigating factor that should be considered is one that would establish that the lawyer did not know right from wrong at the time of the taking. Cases in other jurisdictions are cited holding that restitution should not be considered a mitigating factor in any circumstances. *See Ambrose v. State Bar,* 31 Cal.3d 184, 643 P.2d 486, 181 Cal.Rptr. 903 (1982); *Oklahoma Bar Association v. Lowe,* 640 P.2d 1361 (Okla. 1982); *In re Galloway,* 278 S.C. 615, 300 S.E.2d 479 (1983). The Board acknowledges that other jurisdictions do consider restitution as an appropriate mitigating factor. *See People v. Luxford,* 626 P.2d 675 (Colo.1981); *The Florida Bar v. Pincket,* 398 So.2d 802 (Fla.1981) and *In re Suemnick,* 108 Wis.2d 427, 321 N.W.2d 298 (1982).

We considered restitution to be a mitigating circumstance in *Disciplinary Board of the Supreme Court v. Banks,* 641 S.W.2d 501 (Tenn.1982). Although the circumstances in that case of the lawyer's misuse of a client's funds were significantly different from the case at bar, we think it is appropriate to give consideration to the factor of restitution as a possible mitigating circumstance. The contrast between the facts of this case and *Banks* remind us that there are widely varying degrees of misappropriation of funds and widely varying degrees of the circumstances of restitution. In our view, the objective of achieving uniformity of punishment in disciplinary proceedings does not require that every named offense be accorded identical punishment. Like murder in the first de-

gree, lawyer misappropriation of funds is subject to more than one punishment.

 Under the heading of aggravating and mitigating factors, the hearing panel noted that respondent had diabetes and takes constant medication; that that disease has caused injury to his eyesight and he has had to undergo laser surgery to both eyes; and that he has sought psychological counselling. The chancellor did not mention those factors and we agree with his implicit rejection thereof. No matter how regrettable, health problems are not an appropriate mitigating factor, unless they clearly affect a lawyer's ability to distinguish between right and wrong. Respondent did not assert that he suffered from any physical or mental disability at the time of any of the acts of misappropriation. The chancellor concurred with the hearing committee in finding as mitigating factors restitution, revelation to the probate judge and the Board of Professional Responsibility of his misdeeds, voluntarily ceasing practice and genuine remorse for his misdeeds.

Our scope of review in disciplinary matters is *de novo* upon the record of the trial court with a presumption of correctness unless the evidence preponderates against those findings. *Office of Disciplinary Counsel v. McKinney*, 668 S.W.2d 293 (Tenn.1984). In that case we held that the trial judge should not have imposed a harsher sentence than that imposed by the hearing panel unless the evidence preponderated against the panel's findings. Here, the chancellor expressly said that he could not hold that the evidence preponderated against the judgment of the hearing panel. While this Court is not bound to follow a concurrent finding as to punishment in a disciplinary matter, we think it appropriate to do so in this case.

COOPER, DROWOTA and O'BRIEN, JJ., concur.

HARBISON, C.J., concurs in part and dissents in part.

HARBISON, Chief Justice, concurring in part and dissenting in part.

I concur in the conclusion reached by the majority that fixed or rigid rules for disciplinary sanctions are generally not practicable. Ordinarily all of the circumstances of each individual case must be considered, and I would be reluctant to impose a hard and fast rule that disbarment must follow in every case of embezzlement or defalcation by an attorney.

Nevertheless, there is hardly any misconduct less tolerable or excusable on the part of a lawyer than to embezzle funds of a client. In this case embezzlement took place on six different occasions over a period of more than three years, totalling $20,789.46 out of a small estate which had gross assets of about $28,600.00. Of course, the appellee made partial restitution from time to time, but he testified that he could have made complete restitution long before he did and that he simply could not bring himself to do so "mentally."

Appellee concealed his defalcations from the beneficiary of the estate, from the probate court and from his law firm. The last attempt which he made at restitution was in February 1986, nearly three years after his last embezzlement. He had the poor judgment to make this restitution out of his law firm's trust account. While he reimbursed that account, his defalcation was obvious and would certainly have been exposed when one of the firm members called for an audit of the firm account. It was at that point, and only at that point, that appellee came forward to admit a course of embezzlement which by then had gone on for a period of nearly six years.

In my opinion, no mitigating circumstances have been shown in this case, and I think that disbarment is the appropriate punishment. As pointed out by the majority, the physical health of appellant urged as mitigation neither factually nor legally justifies leniency in this case. The fact that some restitution has been made might be an appropriate circumstance to consider if and when appellee should seek reinstatement to the practice of law; but, in my opinion, the attempts at restitution in this

case are not mitigating circumstances in view of the fact that the defalcations occurred on six separate and distinct occasions beginning on August 19, 1980, and extending through May 18, 1983. Appellee took these funds out of the estate for his personal use and deliberately failed to close this small, simple estate and make disbursement to the single beneficiary who was the only child of the intestate decedent. Only after the enraged and embittered beneficiary angrily called appellee's partner did the defalcations come to light. Appellee was allowed a fee and expenses of nearly one-fourth of this small estate, and he has not yet made restitution of that fee, although he has agreed to do so, at some future date.

I realize that the difference between four years' suspension and the five years attendant upon permanent disbarment is only a matter of degree. Further, I recognize that there is no right of reinstatement whatever after a suspension of either four or five years. Complete restitution, including attorney's fees and interest, has appropriately been made a condition of any effort at reinstatement which appellee may attempt. Nevertheless, deliberate, unexcused embezzlement of client funds is one of the most serious offenses of which a licensed attorney can be guilty. The misconduct shown in this case, in my opinion, disgraces the legal profession and calls for permanent disbarment.