# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 10, 2018 Session

## BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE v. CHARLES EDWARD DANIEL

**Direct Appeal from the Chancery Court for Knox County**
No. 2014-2315-2-AJ        Hon. Telford G. Forgety, Jr., Chancellor

_____

### No. E2017-01170-SC-R3-BP

_____

This direct appeal arises from a disciplinary proceeding against a Knoxville attorney. A hearing panel ("Hearing Panel") of the Board of Professional Responsibility ("Board") found that the attorney had violated Rule 8.4(b) and (c) of the Tennessee Rules of Professional Conduct ("RPC") by misappropriating funds from his law partnership in a manner intended to conceal his actions from his law partners. The Hearing Panel suspended him from the practice of law for three years but ordered the entire suspension served on probation. We conclude that the Hearing Panel did not abuse its discretion by suspending rather than disbarring the lawyer but did abuse its discretion by probating the entire suspension. Accordingly, we modify the Hearing Panel's judgment to include one year of active suspension. In all other respects, the Hearing Panel's judgment is affirmed.

**Tenn. Sup. Ct. R. 9, § 1.3 (2013) (currently Tenn. Sup. Ct. R. 9, § 33.1(d) (2017))**
**Direct Appeal; Judgment of the Chancery Court Affirmed As Modified**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Alan D. Johnson, Brentwood, Tennessee, for the appellant, Board of Professional Responsibility of the Supreme Court of Tennessee.

H. Douglas Nichol, Knoxville, Tennessee, for the appellee, Charles Edward Daniel.

# OPINION

## I. Factual and Procedural Background

The appellee, Charles Edward Daniel, a Knoxville lawyer, received his license to practice law in 1991 following his fifteen-year career in law enforcement positions, including a position with the Internal Revenue Service criminal division. From 1991 to mid-2002, Mr. Daniel worked as a solo practitioner, handling mostly workers' compensation and personal injury cases. In mid-2002 Mr. Daniel and attorney Mike Pemberton formed the law partnership of Daniel Pemberton (the "Partnership"). Mr. Pemberton came to this partnership from another Knoxville law firm where he had served for a time as managing partner. Mr. Daniel and Mr. Pemberton never had a written partnership agreement, and they did not observe formalities in managing the Partnership, including not formalizing any written agreement about how compensation would be handled for cases brought into the Partnership at its inception or how expense advances by any partner would be reimbursed.

From its inception in 2002 until his departure, Mr. Daniel managed and supervised the Partnership's finances, including handling the operating and trust accounts, receiving and accounting for money, making deposits, reviewing and reconciling bank statements, managing day-to-day financial operations, making payroll, paying bills, making payments to third parties and clients, and maintaining and reporting on case expenses. Mr. Daniel used QuickBooks to perform these tasks, and QuickBooks was installed only on Mr. Daniel's computer.

The Partnership broke up in late 2009 or early 2010. After Mr. Daniel left, another partner, Dana Scott Pemberton,[1] the wife of Mr. Pemberton, took over his financial oversight responsibilities, and QuickBooks had been installed on her computer by January 2010. Mrs. Pemberton soon discovered that from 2006 to 2009, Mr. Daniel had, on several occasions, deposited client settlement checks into the Partnership's trust account and then written three checks on that account—one payable to the client and two payable to the Partnership. He would then deposit one of the checks payable to the Partnership into the Partnership's operating account and deposit the second check payable to the Partnership into his own personal account.

In May 2010, the Pembertons reported these suspicious transactions to the Board of Professional Responsibility. The Board first contacted Mr. Daniel about the allegations on June 22, 2010. Meanwhile, civil litigation was initiated to dissolve the Partnership and divide its assets. The parties reached a confidential settlement of the civil litigation in July 2011.

---

[1] Mrs. Pemberton and her brother, James Scott, had joined the firm in 2002, before her marriage to Mr. Pemberton. By 2003, they were junior partners. The firm was renamed Daniel, Pemberton, Scott & Scott, PLLP.

Almost three years after the civil litigation settled, on May 2, 2014, the Board filed a petition for discipline against Mr. Daniel.[2] The Board alleged that he had "willfully and knowingly engaged in a course of conduct whereby he embezzled money from the [P]artnership, misappropriated [P]artnership funds and falsified records in order to conceal his illicit activities." The Board asserted that Mr. Daniel's conduct violated subsections (b) and (c) of RPC 8.4, which state:

It is professional misconduct for a lawyer to:

* * *

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

The Hearing Panel held a hearing on March 1 and 2, 2016. The Board called Mr. and Mrs. Pemberton to testify and submitted bank records documenting the suspicious transactions from 2006-2009. Mr. Daniel testified on his own behalf and called various witnesses, many of them attesting to his good character. Mr. Daniel's defense was that the Partnership owed him a great deal of money for operating expenses he had advanced and partner draws he had skipped when the Partnership lacked funds. He maintained that he had merely reimbursed himself when funds became available from settlements by writing checks on the Partnership trust account payable to the Partnership and then depositing those checks into his personal account. Mr. Daniel submitted settlement agreements with clients and a spreadsheet showing fees and expenses for cases that purported to account for all of the withdrawals from the Partnership's trust account.

Before the Hearing Panel, Mr. Daniel testified that, for a significant time after the Partnership's formation, he had advanced funds as needed to cover all of the Partnership's operating expenses, including compensation for the attorneys and support staff. Mr. Daniel testified that he had kept a handwritten ledger on a yellow legal pad of the amounts he had advanced the Partnership and the amounts he had reimbursed himself for these advances. By the time of the hearing Mr. Daniel had lost this legal pad, however, so it was not submitted into evidence before the Hearing Panel. Nevertheless, Mr. Daniel testified that Mr. Pemberton was aware of the handwritten ledger, explaining that he had shared it and discussed it with Mr. Pemberton periodically. Mr. Daniel testified that he had believed it was appropriate to reimburse himself amounts he was owed by writing checks from the Partnership trust account payable to the Partnership and then depositing those checks into his personal account. Mr. Daniel testified that he had

---

[2] Some of this lengthy delay may be attributable both to the Partnership litigation and to the pendency of criminal charges against Mr. Daniel, which were not resolved until August 12, 2013.

discussed the withdrawals and method of reimbursement with Mr. Pemberton. Mr. Daniel denied taking client money.[3] Mr. Daniel acknowledged that he had not maintained the most straightforward accounts because he "was not a bookkeeper" but stated that he had done "the best [he] could do."

Mr. Pemberton, by contrast, denied knowledge of either the handwritten ledger Mr. Daniel claimed to have maintained or Mr. Daniel's method of reimbursing himself by depositing checks payable to the Partnership in his personal account. Both of the Pembertons testified that they had relied on Mr. Daniel to handle all financial oversight of the Partnership until he left and Mrs. Pemberton had taken over those duties. Mr. Pemberton testified that the partners had held brief, formal meetings only four or five times a year to discuss the state of the Partnership, including budgetary issues.

Mr. Pemberton admitted drafting memos for those meetings summarizing, among other things, the Partnership budgets. Although none of the memos were introduced into evidence, Mr. Pemberton conceded that he had accessed the Partnership's accounting software to prepare the memos. He emphasized, however, that "[a]ll the financial information that we got, other than me running the P[rofit] & L[oss] and running the accounts receivables . . . came from Mr. Daniel" at least until January 2010.

The Pembertons also disputed Mr. Daniel's claim that the Partnership owed him money after 2006. According to the Pembertons, the Partnership had fully reimbursed Mr. Daniel and all of the partners by 2006 for funds advanced to the Partnership and back draws missed. The Pembertons maintained that they had confirmed the Partnership was "square" with Mr. Daniel in conversations that they had with him. To support this assertion, they pointed to a December 5, 2005 check Mr. Daniel had received in the amount of $236,574.31. This check was in addition to the draws Mr. Daniel and the other partners had received from the Partnership at the same time.

By contrast, Mr. Daniel testified that the December 5, 2005 check was the first time the Partnership had enough funds to reimburse him any of the funds he had advanced or draws he had skipped. Mr. Daniel testified that the December 5, 2005 check only reimbursed him for funds he had advanced on the cases that settled in 2005. He asserted that this check was not sufficient to reimburse him for all funds he had advanced the Partnership since its inception and was not enough to repay him the entire amount he was owed.[4]

---

[3] Ultimately there was no proof offered of misappropriation of client money.

[4] In his answer to the petition, Mr. Daniel admitted taking a total of $673,211.83 from the Partnership. The spreadsheet Mr. Daniel submitted indicated that the Partnership owed him approximately $827,000. The record does not reflect the amount of the confidential settlement of the civil litigation involving the Partnership and its assets.

- 4 -

Some of the disagreement about the amounts the Partnership owed Mr. Daniel arose from Mr. Pemberton's and Mr. Daniel's conflicting understanding of how fees on cases Mr. Daniel brought to the Partnership in 2002 were to be shared with the Partnership. Again, Mr. Daniel and Mr. Pemberton had no written agreement addressing this issue, which would have simplified matters before the Hearing Panel. But the proof was undisputed that, regarding fees on cases Mr. Pemberton brought to the Partnership, the fees were allocated according to the percentage of work performed on each case before and after formation of the Partnership. Mr. Daniel testified that the same arrangement applied to fees on cases he brought to the Partnership. Mr. Daniel's testimony about the fee allocation was supported by that of attorney Tom Overton, who was collaborating with Mr. Daniel on his biggest cases when the Partnership was formed in 2002.

On the other hand, Mr. Pemberton testified that, with the single exception of the large case, or set of cases, that Mr. Daniel was working on with Mr. Overton in 2002, Mr. Daniel had agreed to split final fees on his pre-existing cases equally with the Partnership when each case was resolved. Mr. Pemberton's testimony was supported by the following testimony Mr. Daniel gave in a 2004 deposition during his divorce proceedings, which the Board introduced into evidence:

Q: When it was just Mike [Pemberton] and you, how did you divide the income?

Mr. Daniel: We just split it up even.

Q: So, it was 50/50 from day one?

Mr. Daniel: Yes, ma'am, as best I remember, it was.

Q: Okay, before [Mr. Pemberton] came and you were a sole practitioner and you had cases that were—you were already working when he came, did you divide[] the income from those cases or did you retain those cases as separate from the [P]artnership?

Mr. Daniel: I divided all but part of one case as best I remember.

In addition to this disagreement about fees on pre-existing cases, a later disagreement about fees culminated in Mr. Daniel's departure from the Partnership. This fee dispute centered on how Mr. Daniel had agreed to allocate a substantial fee received from a settlement of a wrongful death action. The wrongful death action stemmed from the 2008 disappearance and murder of a young woman who had been staying in a Knoxville hotel while in town as an employee trainer for a new restaurant. Matthew Cook, a newly licensed lawyer whom Mr. Daniel had begun mentoring in 2007 and who shared the Partnership's office space, brought the wrongful death case to Mr. Daniel. Mr.

Daniel and Mr. Cook represented the young woman's mother, and an Alabama lawyer represented the young woman's father in the wrongful death suit against the hotel where she had been staying. The Alabama counsel, Mr. Cook, and Mr. Daniel negotiated a fee arrangement. The case eventually settled for a significant sum. Mr. Daniel paid Mr. Cook his portion of the attorney fees. But Mr. Pemberton disputed the payment and maintained that Mr. Cook had received fees to which he was not entitled at the expense of the Partnership. As a result of this fee dispute, relations deteriorated between Mr. Daniel and the other partners, and Mr. Daniel left the Partnership.

Several character witnesses testified on Mr. Daniel's behalf, including Assistant United States Attorney Steven Cook, former District Attorney General Randall Nichols, attorneys Thomas Overton, Deborah Fulton, Ronald Attanasio, Steve Sharp, Matthew Cook, and a former paralegal employee of the Partnership, Sonya Cooper. These character witnesses described Mr. Daniel as a competent lawyer and an honest person who provided substantial pro bono services for clients. Mr. Daniel's character witnesses admitted, however, that they had little or no knowledge of the facts or allegations of the petition for discipline.[5]

The Hearing Panel made extensive findings of fact. The last finding summarized the case this way:

> Based on [] the evidence submitted at trial, the Panel finds that Respondent believed that the Partnership owed Respondent money based on funds he advanced to fund the operation of the Partnership from its inception and for fees he earned on cases he brought to the Partnership. The Panel finds that rather than address the issue of what money, if any, Respondent was owed by the Partnership through formal negotiation or litigation with the other partners, that Respondent instead paid himself directly from cases that were settled through the check writing scheme described above. The Panel finds that Respondent did not make the other partners of the Partnership aware of what he was doing. The Panel finds that the manner in which Respondent repaid himself money to which he thought he was owed was conducted in a way to conceal his actions from his other partners. The Panel finds that Respondent wrongfully took money from the Partnership.

---

[5] Two of the character witnesses, Matthew Cook and Sonya Cooper, worked on the wrongful death suit that precipitated the break-up of the Partnership but were not involved in or knowledgeable about the Partnership's accounting management or software. Mr. Daniel had represented another character witness, Ronald Attanasio, in a business dispute. Mr. Pemberton, who suspected that Mr. Daniel had stolen client funds after discovering irregularities in the Partnership's accounting books, had contacted Mr. Attanasio. Mr. Attanasio assured Mr. Pemberton that Mr. Daniel had not misappropriated any funds in his case, but Mr. Attanasio was otherwise unaware of the facts underlying the Board's allegations against Mr. Daniel.

Based on these factual findings, the Hearing Panel concluded as a matter of law that Mr. Daniel violated both RPC 8.4(b) and (c) by "purposely and wrongfully deposit[ing] funds that belonged to the Partnership into his own account."

Having found these violations, the Hearing Panel then consulted the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards"), specifically ABA Standards 5.11 and 5.12, to guide its imposition of an appropriate sanction.

The Hearing Panel next found the following aggravating factors, pursuant to ABA Standard 9.22, present in this case: (1) Mr. Daniel's "dishonest or selfish motive"; (2) "pattern of misconduct"; and (3) "substantial experience in the practice of law." The Hearing Panel also found the following mitigating factors, pursuant to ABA Standard 9.32, present in this case: (1) Mr. Daniel's "absence of a prior disciplinary record"; (2) "full and free disclosure to [the] disciplinary board and cooperative attitude toward the proceedings"; (3) "good character, reputation, competency as a lawyer, and contribution to the practice of law"; (4) the fact that "[n]o client was deprived of any money"; and (5) "[t]he delay in the disciplinary proceedings against [Mr. Daniel]."

The Hearing Panel then compared Mr. Daniel's misconduct to the misconduct at issue in what it considered to be similar cases. In distinguishing Mr. Daniel's misconduct from the attorney misconduct in Lockett v. Board of Professional Responsibility, 380 S.W.3d 19 (Tenn. 2012), the Hearing Panel stated that "although the Panel finds that [Mr. Daniel] intended to permanently deprive his partners of the funds that he misappropriated from the Partnership, he did so based upon his sincere belief that these funds were owed to him from the Partnership." The Hearing Panel then sanctioned Mr. Daniel to a three-year suspension but ordered the entire suspension served on probation.

The Board appealed to the Chancery Court, arguing that the Hearing Panel abused its discretion by suspending rather than disbarring Mr. Daniel. The Chancery Court affirmed, concluding that the Hearing Panel's judgment was not arbitrary or capricious and was supported by substantial and material evidence. The Chancery Court stated that the Hearing Panel's judgment was not entirely clear on the question of "criminal intent," comparing the Hearing Panel's conclusion that Mr. Daniel violated RPC 8.4(b) and (c) with its statement that he sincerely believed the Partnership owed him the funds. Nevertheless, the Chancery Court concluded that, even construing the Hearing Panel's judgment as including findings "that equate to criminal intent," given the multiple mitigating factors, the Hearing Panel did not abuse its discretion by imposing a sanction of suspension with complete probation rather than disbarment. The Board then appealed to this Court. See Tenn. Sup. Ct. R. 9, § 1.3 (currently § 33.1(d)).[6]

---

[6] The 2006 version of Tennessee Supreme Court Rule 9 is used in this case because this matter was initiated before January 1, 2014, when comprehensive changes to Rule 9 became effective.

## II. Standard of Review

The Tennessee Supreme Court is the source of authority of the Board and all its functions. Long v. Bd. of Prof'l Responsibility, 435 S.W.3d 174, 178 (Tenn. 2014) (citing Brown v. Bd. of Prof'l Responsibility, 29 S.W.3d 445, 449 (Tenn. 2000)). As part of our duty to regulate the practice of law in Tennessee, we bear ultimate responsibility for enforcing the rules governing the legal profession. Id. (citing Doe v. Bd. of Prof'l Responsibility, 104 S.W.3d 465, 469–70 (Tenn. 2003)). We review judgments under our "inherent power [and] essential and fundamental right to . . . administer [the] rules pertaining to the licensing . . . of attorneys." Hughes v. Bd. of Prof'l Responsibility, 259 S.W.3d 631, 640 (Tenn. 2008) (quoting In re Burson, 909 S.W.2d 768, 773 (Tenn. 1995)).

Attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which determines if a violation has occurred and, if so, the disciplinary penalty. Maddux v. Bd. of Prof'l Responsibility, 409 S.W.3d 613, 621 (Tenn. 2013) ("Maddux III").[7] Either party may appeal a hearing panel's decision to the circuit or chancery court, where review is conducted upon "the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 1.3 (currently § 33.1(d)). Either party then may appeal from the trial court's decision directly to this Court, where the cause is heard "upon the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel." Id.

We apply the same standard of review as applied by the trial court and do not disturb a hearing panel's decision unless the hearing panel's findings, inferences, conclusions or decisions are:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction, (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Id. § 1.3 (currently 33.1(b)); Moncier v. Bd. of Prof'l Responsibility, 406 S.W.3d 139, 150 (Tenn. 2013). We review questions of law de novo but do not substitute our judgment for that of a hearing panel as to the weight of the evidence on questions of fact. Maddux III, 409 S.W.3d at 622. Finally, a hearing panel's findings as to aggravating and mitigating factors are also reviewed in accordance with the five enumerated

---

[7] While we do not discuss a second disciplinary case against this same attorney in this opinion, Maddux v. Bd. of Prof'l Responsibility, 288 S.W.3d 340 (Tenn. 2009), we refer to the third case against the named attorney as "Maddux III" to avoid any possible confusion.

circumstances in Tennessee Supreme Court Rule 9, section 1.3. <u>Lockett</u>, 380 S.W.3d at 23.

### III. Analysis

To assess the appropriateness of the disciplinary sanction in a given case, we begin, as did the Hearing Panel here, with the ABA Standards. <u>See</u> Tenn. Sup. Ct. R. 9, § 8.4 (currently § 15.4); <u>Maddux III</u>, 409 S.W.3d at 624. The ABA Standards are "guideposts" rather than rigid rules for determining appropriate and consistent sanctions for attorney misconduct. <u>Maddux III</u>, 409 S.W.3d at 624. As the ABA Standards note:

> While there may be particular cases of lawyer misconduct that are not easily categorized, the standards are not designed to propose a specific sanction for each of the myriad of fact patterns in cases of lawyer misconduct. Rather, the standards provide a theoretical framework to guide the courts in imposing sanctions. The ultimate sanction imposed will depend on the presence of any aggravating or mitigating factors in that particular situation. The standards thus . . . are guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct.

ABA Standards, Theoretical Framework.

The first step is to identify the presumptive sanction based on the following considerations: (1) the ethical duty the lawyer violated—whether to a client, the public, the legal system, or duties as a professional; (2) the lawyer's mental state; and (3) the extent of the actual or potential injury caused by the lawyer's misconduct. <u>Bd. of Prof'l Responsibility v. Cowan</u>, 388 S.W.3d 264, 268 (Tenn. 2012) (citing the ABA Standards, Preface). Next, any aggravating or mitigating circumstances must be considered in determining whether to increase or decrease the presumptive sanction in a particular case. <u>Id.</u> (discussing ABA Standard 9).

### A. Presumptive Sanction: Disbarment or Suspension?

Before this Court the parties do not dispute that Mr. Daniel violated a duty to the public. They agree that ABA Standard 5.1—Failure to Maintain Personal Integrity— applies to Mr. Daniel's misconduct of intentionally concealing transactions from his partners and misappropriating partnership funds.[8] The dispute here arises because the Hearing Panel identified both ABA Standards 5.11 and 5.12 as appropriate guides for

---

[8] Neither party disputes the Hearing Panel's finding that "[n]o client was deprived of any money belonging or owed to a client" so ABA Standard 4.0—Violations of Duties Owed to Clients—does not apply. Nor was the misconduct in the context of legal proceedings so ABA Standard 6.0—Violations of Duties Owed to the Legal System—does not apply either.

choosing presumptive sanctions in this case. The Board argues that the Hearing Panel should have relied on ABA Standard 5.11, alone, which establishes disbarment as the presumptive sanction. Mr. Daniel responds that the Hearing Panel did not commit reversible error by identifying both. We turn to the relevant text. ABA Standard 5.1—Failure to Maintain Personal Integrity—states:

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

> 5.11 Disbarment is generally appropriate when:

> (a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

> (b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

> 5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

The Hearing Panel clearly determined that Mr. Daniel violated RPC 8.4(b) and (c). Mr. Daniel has not challenged this finding on appeal. In finding a violation of RPC 8.4(b) and (c), the Hearing Panel necessarily found that Mr. Daniel committed "a criminal act that reflects adversely on [his] honesty, trustworthiness, or fitness as a lawyer in other respects" and also found that he engaged "in conduct involving dishonesty, fraud, deceit, or misrepresentation." Tenn. Sup. Ct. R. 8, RPC 8.4(b) & (c). In addition, the Hearing Panel's findings that Mr. Daniel "wrongfully took money from the Partnership," and "intended to permanently deprive his partners of the funds that he misappropriated from the Partnership," indicate that the Hearing Panel found that Mr. Daniel committed theft or a series of thefts. See Tenn. Code Ann. § 39-14-103 (2014 & Supp. 2017) ("A person commits theft of property, if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the

owner's effective consent.").[9]    Given these findings that Mr. Daniel intentionally committed serious criminal conduct, the Hearing Panel was correct in identifying ABA Standard 5.11 as an appropriate guidepost for selecting the presumptive sanction.

This is not to say, however, that the Hearing Panel had no authority to also consider ABA Standard 5.12. To the contrary, we reiterate that "[t]he ABA Standards 'are not designed to propose a specific sanction for each of the myriad of fact patterns in cases of lawyer misconduct,' and they are 'not analogous to criminal determinate sentences.'" Maddux III, 409 S.W.3d at 624 (quoting ABA Standards, Theoretical Framework). As we explained in Cowan, a hearing panel may consider the full panoply of sanctions applicable to lawyer misconduct, including admonition, reprimand, suspension, or disbarment, even if a particular ABA Standard does not explicitly describe the fact pattern in question. See 388 S.W.3d at 270.[10] Any other interpretation would be incongruous with using the ABA Standards as flexible guideposts.

Hearing panels should precisely and clearly identify all ABA Standards that are relied upon for guidance in determining an appropriate sanction and should clearly and concisely articulate findings of fact and conclusions of law. Doing so serves both to inform the parties of the grounds for a hearing panel's decision and facilitate appellate review. Identifying the correct or most appropriate presumptive sanction may in some cases be outcome determinative in this Court's review. See Cowan, 388 S.W.3d at 270. Hearing panels may on occasion be confronted with fact patterns that do not neatly fit into a single ABA Standard, as this Court has been. Talley v. Bd. of Prof'l Responsibility, 358 S.W.3d 185, 194 (Tenn. 2011) ("From our own review of the record and the arguments presented, it is not entirely clear whether [Attorney's] facilitation of securities fraud falls within ABA Standards § 5.11(a) or (b) which presumptively result in disbarment or ABA Standards § 5.12 which presumptively results in suspension."). Even in the rare case where lawyer misconduct seems to fall between presumptive sanctions or within multiple ABA Standards identifying different presumptive sanctions, hearing panels and this Court remain able and authorized to make an ultimate determination on the appropriate sanction. Under such circumstances, hearing panels may identify all relevant ABA Standards and then determine a sanction within the range of the presumptive sanctions identified in the relevant ABA Standards. The Hearing Panel in this case did just that.

---

[9] The theft statute is also the only criminal statute the parties cited in their briefs to this Court.

[10] In Cowan, we noted that reprimand or admonition may be appropriate in cases where a lawyer has committed criminal acts despite the fact that ABA Standards 5.13 and 5.14 do not specifically mention criminal conduct. 388 S.W.3d at 270 ("a contrary interpretation would imply that the Standards fail to provide any sanction less serious than suspension for criminal conduct precisely *because* the conduct was criminal").

Here, the Hearing Panel's determination that Mr. Daniel violated RPC 8.4(b) and (c) clearly mandated consideration of ABA Standard 5.11. The Hearing Panel also found that Mr. Daniel acted intentionally to conceal transactions from his partners even though he believed that he was entitled to those funds. By the time of the proceedings before the Hearing Panel, Mr. Daniel and the Partnership had settled civil litigation arising out of these transactions. Upon considering the duty violated, Mr. Daniel's mental state, and the actual or potential injury resulting from his misconduct, we cannot say that the Hearing Panel acted arbitrarily and capriciously in considering both ABA Standard 5.11, identifying disbarment, and ABA Standard 5.12, identifying suspension as the presumptive sanctions relevant to this case.

### B. The Assessment of Aggravating and Mitigating Factors

Next, we turn to the Hearing Panel's assessment of the aggravating and mitigating factors, which guided its ultimate decision to choose disbarment or some form of suspension. Again, the ABA Standards provide guidance in an "illustrative rather than exclusive" list of various aggravating and mitigating factors in sections 9.1, 9.2, and 9.3. Bailey v. Bd. of Prof'l Responsibility, 441 S.W.3d 223, 235 (Tenn. 2014) (quoting Lockett, 380 S.W.3d at 28).

### 1. Aggravating Factors

The Hearing Panel found the existence of three aggravating factors: (1) dishonest or selfish motive; (2) pattern of misconduct; and (3) experience in the practice of law. Mr. Daniel does not contest the application of these factors, and we therefore apply them.

Before this Court the Board argues that three other aggravating factors apply which were not included in the Hearing Panel's or trial court's judgments: (1) that Mr. Daniel committed multiple offenses; (2) refused to acknowledge the wrongful nature of his conduct; and (3) committed wrongful acts against vulnerable victims, his law partners. We review the application of these factors in accordance with Tennessee Supreme Court Rule 9, section 1.3. Lockett, 380 S.W.3d at 22–23.

The Board acknowledged that the Hearing Panel applied "pattern of misconduct," ABA Standard 9.22(c), as an aggravating factor but argues that it also should have applied "multiple offenses," ABA Standard 9.22(d), as an aggravating factor as the hearing panel did in Board of Professional Responsibility v. Maddux, 148 S.W.3d 37, 41 (Tenn. 2004) ("Maddux I"), where, similar to this case, there were multiple misappropriations over a three-year period. We agree that the evidence would support a finding of this aggravating factor. However, nothing compelled the Hearing Panel to apply both aggravating factors in the circumstances of this case. As Mr. Daniel points out, the multiple instances of misappropriations by writing checks would underlie both the pattern of misconduct factor and multiple offenses factor if both were applied, resulting in double consideration of essentially the same circumstances. The fact that the

- 12 -

Hearing Panel chose to include "pattern of misconduct" but not "multiple offenses" was not arbitrary and capricious.[11]

Next, the Board argues that Mr. Daniel's refusal to acknowledge the wrongful nature of his conduct should have been applied as an aggravating factor. Mr. Daniel mounted a defense to the Board's charges, claiming that he made his partners aware of his transactions and that he was entitled to all the funds he withdrew. While the Hearing Panel did not credit his defense in its entirety, the mounting of a defense, without more, should not be applied as an aggravating factor.[12] Because the Board only argues that "Mr. Daniel took the position that he was owed the money that he misappropriated" as a basis for this factor, which was Mr. Daniel's defense, we find that the Hearing Panel did not err by refusing to apply this aggravating factor.

Finally, the Board argued to the trial court and before this Court that Mr. Daniel's wrongful conduct while managing the firm's accounts should have been considered an aggravating factor due to the vulnerability of his victims. We agree. "[T]he fiduciary duty of loyalty that exists between partners and the trust that law firms must place in their attorneys to act as representatives of the firm cause[s] the law firm to be vulnerable with

---

[11] Mr. Daniel has not challenged application of pattern of misconduct here, and we need not define its parameters or any potential overlap with the parameters of the related multiple offenses aggravating factor. We acknowledge, however, a lack of precision in some of our own prior decisions describing and applying these factors. See, e.g., Lockett, 380 S.W.3d at 29 (describing "a pattern of multiple instances of misconduct" as "consistent with ABA Standards 9.22[](c)[] and (d)"); Maddux III, 409 S.W.3d at 628 (describing attorney's "prior disciplinary proceedings [that] involved similar misconduct" as weighing "heavily in aggravation" without citing the "pattern of misconduct" aggravating factor). We note as well that some decisions suggest that "multiple offenses" rather than "pattern of misconduct" more properly applies in the circumstances of this case. See, e.g., Threadgill v. Bd. of Prof'l Responsibility, 299 S.W.3d 792, 810 (Tenn. 2009), overruled by Lockett, 380 S.W.3d 19 on a separate legal issue; Matter of Levine, 811 S.E.2d 349, 353 (Ga. 2018); In re Disc. of Walton, 287 P.3d 1098, 1104 (Or. 2012); In re Disc. Proc. Against Brothers, 70 P.3d 940, 945 (Wash. 2003); Matter of Disc. Proc. Against McMullen, 896 P.2d 1281, 1291 (Wash. 1995), as amended (July 25, 1995); In re Reardon, 759 A.2d 568, 577 (Del. 2000); People v. Bontrager, 407 P.3d 1235, 1278–79 (Colo. O.P.D.J. 2017).

[12] Other state courts have used similar reasoning in assessing this aggravating factor. See In re Smith, 236 P.3d 137, 149 (Or. 2010) ("the accused's reliance on [] arguments [for his defense]—although unavailing—cannot be used to enhance the penalty that would otherwise be imposed for his violations"); Attorney Grievance Comm'n v. Monfried, 794 A.2d 92, 105 (Md. 2002) ("The mere filing of the exceptions in the exercise of an attorney's right under the Maryland Rules does not equate to lack of remorse."); In re Suttle, 701 S.E.2d 154, 155–56 (Ga. 2010) ("As an initial matter, we recognize that an attorney's refusal to acknowledge the wrongful nature of his or her behavior should not automatically be considered a factor in aggravation of punishment, particularly in the face of an honest and objectively reasonable belief in one's own innocence."); In re Davenport, 49 P.3d 91, 104 (Or. 2002) ("To invoke ABA Standard 9.22(g), the Bar must point to some other evidence, aside from an accused lawyer's refusal to concede the Bar's factual allegations, to support a finding that the lawyer has refused to acknowledge the wrongful nature of his or her conduct."); In re Marshall, 217 P.3d 291, 307 (Wash. 2009) ("Although [respondent] has shown no penitence for his actions, we do not penalize him for making arguments in his defense.").

- 13 -

respect to [the attorney's] misconduct." Maddux I, 148 S.W.3d at 41. That vulnerability is even more pronounced here, where Mr. Daniel, apart from being a partner in his firm, also solely managed the Partnership's finances and account books. Thus, the Hearing Panel erred by failing to consider the vulnerability of the victims as an aggravating factor.

## 2. *Mitigating Factors*

The Hearing Panel found the existence of five mitigating factors asserted by Mr. Daniel pursuant to ABA Standard 9.32: (1) Mr. Daniel's "absence of a prior disciplinary record"; (2) "full and free disclosure to [the] disciplinary board and cooperative attitude toward the proceedings"; (3) "good character, reputation, competency as a lawyer, and contribution to the practice of law"; (4) the fact that "[n]o client was deprived of any money"; and (5) "[t]he delay in the disciplinary proceedings against [Mr. Daniel]." The Board does not challenge the factors involving Mr. Daniel's disclosure and cooperative attitude, the delay in proceedings, or the absence of a prior disciplinary record, and we agree those factors apply in this case.

The Board does object to the Hearing Panel's finding as a mitigating factor that "[n]o client was deprived of any money." We have not previously considered whether this fact may be considered as a mitigating factor or should only be considered in determining which ABA Standards apply to establish the presumptive sanction. We note that ABA Standard 4.0 generally establishes presumptive sanctions for violations of duties owed to clients. Standard 4.1 addresses failure to preserve the client's property and identifies disbarment as the presumptive sanction "when a lawyer knowingly converts client property and causes injury or potential injury to a client." ABA Standard 4.11. In contrast, ABA Standard 5.11 identifying disbarment as the presumptive sanction requires intentional conduct. We note that the Supreme Court of Minnesota has recently reversed an earlier decision and now holds that whether client money was taken should only be considered in determining the appropriate presumptive sanction and should not be considered as a mitigating factor. In re Disc. Action v. Bonner, 896 N.W.2d 98, 109–10 (Minn. 2017).

While we tend to agree that this fact is more appropriately considered in the context of identifying the presumptive sanction under the ABA Standards, we recognize that Tennessee law affords hearing panels broad discretion to consider any fact in mitigation. See Lockett, 380 S.W.3d at 27–28 (quoting ABA Standard 9.31). In light of this broad discretion and our own deferential standard of review, we cannot say that the Hearing Panel abused its discretion by considering that no client was deprived of any money as a mitigating factor.

Finally, the Board argues that little weight should be given to the witnesses who testified as to Mr. Daniel's good character. In a different context, we have explained that less weight should be given to a character witness's testimony if that witness does not know the details of the factual allegations against an attorney. Culp v. Bd. of Prof'l

Responsibility, 407 S.W.3d 201, 208–09 (Tenn. 2013) (discussing Milligan v. Bd. of Prof'l Responsibility, 301 S.W.3d 619, 632 (Tenn. 2009)). The Hearing Panel stated that Mr. Daniel's "character witnesses admitted that they had little or no knowledge of the facts of this case and the allegations set forth" against Mr. Daniel. Thus, we cannot say that the Hearing Panel gave inappropriate weight to this mitigating factor.[13]

In summary, the Hearing Panel erred in failing to find an aggravating factor, the vulnerability of Mr. Daniel's victims, but otherwise did not abuse its discretion in choosing which aggravating and mitigating factors to consider. Thus we move to our own analysis of what constitutes adequate discipline in this case.

### C. Comparable Discipline

This Court "evaluate[s] each instance of attorney discipline in light of its particular facts and circumstances," even as it "consider[s] the sanctions that have been imposed in prior cases that present similar circumstances so as to maintain consistency and uniformity in disciplinary proceedings." Maddux I, 148 S.W.3d at 40. However, "the objective of achieving uniformity of punishment in disciplinary proceedings does not require that every named offense be accorded identical punishment." Bd. of Prof'l Responsibility v. Bonnington, 762 S.W.2d 568, 570 (Tenn. 1988). While the misappropriation of funds by an attorney is serious misconduct, we have previously rejected "a hard and fast rule that all misappropriations of funds by lawyers should result in disbarment," instead recognizing that "there are widely varying degrees of misappropriation of funds." Id.

Maddux I was our first case addressing "the question of the proper sanction in cases involving an attorney's misappropriation of fees from his or her own law firm." 148 S.W.3d at 40. The attorney in Maddux I misappropriated over ninety thousand dollars in law firm funds during the turbulent break-up of the law partnership at a time when senior partners had halted all monthly draws. Id. at 38. The attorney claimed that he took law firm funds with an eye towards gaining "leverage for negotiating with his partners." Id. Based on a finding that the attorney in Maddux I "lacked criminal intent" and that his conduct adversely reflected on his fitness to practice law rather than *seriously*

---

[13] Additionally, the Board argues that character witness testimony should not mitigate the level of sanctions in misappropriations cases because of the seriousness of the misconduct at issue. See Matter of Siegel, 627 A.2d 156, 161 (N.J. 1993) ("[a]lthough good reputation, prior trustworthy professional conduct, and general good character are often considered as mitigating factors . . . , their importance is diminished where misappropriation is involved"). However, the New Jersey case that the Board cites to was later summarized to mean that "misappropriation of client or law firm funds will almost invariably result in disbarment" and that only the most exceptional mitigating circumstances would result in a sanction less than disbarment. Matter of Greenberg, 714 A.2d 243, 244 (N.J. 1998). We have not adopted that policy in Tennessee. See Bd. of Prof'l Responsibility v. Bonnington, 762 S.W.2d 568, 570–71 (Tenn. 1988); Maddux I, 148 S.W.3d at 40 ("no one sanction is necessarily more appropriate than any other" in cases of attorney misappropriation of law firm funds).

adversely reflected on his fitness to practice, we were guided by ABA Standard 5.13 which set reprimand as the presumptive sanction. Id. at 40–41. Based on the balance of aggravating and mitigating circumstances in that case, we affirmed a thirty-day active suspension followed by a one-year probationary suspension on the attorney-respondent. Id. at 42. While there are many similarities between the case before us and Maddux I, the Hearing Panel's determination that ABA Standards 5.11 and 5.12 apply include the finding of misconduct that seriously adversely reflects on Mr. Daniel's fitness to practice[14] and here the baseline sanction is either suspension or disbarment.

In Lockett, the attorney received a four-year active suspension for criminal conduct including the misappropriation of law firm funds and a willful failure to file income tax returns. 380 S.W.3d at 21. Despite identifying ABA Standard 5.11 and disbarment as the presumptive baseline sanction, the attorney in Lockett was suspended and not disbarred. Id. at 29–30. We distinguished Lockett from Maddux I by noting that the attorney in Maddux I "did not have a criminal intent to keep the converted funds permanently" while the attorney in Lockett "pleaded guilty to having a criminal intent to permanently deprive his law firm of the misappropriated funds." Id. at 30. Here, the Hearing Panel found that Mr. Daniel "intended to permanently deprive his partners of the funds that he misappropriated from the Partnership," like the attorney in Lockett and unlike the attorney in Maddux.

In Bonnington, 762 S.W.2d 568, a lawyer was sanctioned with a four-year active suspension for misappropriating client and law firm funds. The attorney in Bonnington made multiple withdrawals from an estate account he was administering although he later deposited funds back into the estate account. Id. at 569. The final deposit that the attorney made to reimburse the estate account was from his law firm's trust account and the attorney self-reported his misappropriations to the Board of Professional Responsibility at about the same time that his law firm was conducting an audit of his handling of the estate account. Id.

In all of these comparison cases the length of the suspensions imposed are similar to the suspension in this case, but the attorneys in the comparison cases were all required to serve at least some period of active suspension. See Lockett, 380 S.W.3d at 30 (affirming the hearing panel's imposition of a four-year suspension without a probationary period); Maddux I, 148 S.W.3d at 41–42 (affirming a thirty-day suspension and a one-year probationary period afterwards, even though the presumptive sanction was reprimand); Bonnington, 762 S.W.2d at 570–71 (affirming a four-year suspension which was "only one year short of the maximum punishment of disbarment" and without a probationary period).

---

[14] Both ABA Standards 5.11(b) and 5.12 are generally appropriate when attorney misconduct "seriously adversely reflects on the lawyer's fitness to practice."

In summary, the Hearing Panel failed to find an applicable aggravating factor, the vulnerability of Mr. Daniel's law partner victims, and the sanction imposed by the Hearing Panel, probating the entire three-year suspension, is out of line with the sanctions in comparable cases. Other than noting that the parties' civil litigation settlement removed the need for restitution as a probation condition, the Hearing Panel also gave no explanation for why it decided to probate Mr. Daniel's entire period of suspension. Nor did the Hearing Panel impose any conditions, probation monitoring, or supervision of Mr. Daniel during the probationary period. See Tenn. Sup. Ct. R. 9, § 8.5 (currently Tenn. Sup. Ct. R. 9, § 14) ("Probation shall be used only in cases where there is little likelihood that the respondent will harm the public during the period of rehabilitation and where the conditions of probation can be adequately supervised."). For all the foregoing reasons, we conclude that the Hearing Panel acted arbitrarily and capriciously by probating the entirety of Mr. Daniel's suspension.

Thus, to attain an appropriate sanction, comparable to sanctions imposed in other similar cases and reflecting the aggravating and mitigating factors, we modify Mr. Daniel's three-year suspension to include one year of active suspension followed by probation for the remainder of the suspension.

## IV. Conclusion

For the reasons stated herein, we affirm as modified the Chancery Court's judgment. Costs of this appeal are taxed to Mr. Daniel, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

- 17 -