IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
Assigned on Briefs May 22, 2024

## DARYL A. GRAY v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-22-1196    Roy B. Morgan, Jr., Senior Judge**

———————————————————

**No. W2023-01265-SC-R3-BP**

———————————————————

A hearing panel of the Board of Professional Responsibility concluded that Daryl A. Gray violated Rules 1.3, 1.4, 1.15(d) and (e), 1.16, 4.1(a), and 8.4(c) of the Tennessee Rules of Professional Conduct and suspended him from the practice of law for six months. The violations stemmed from two separate complaints, both involving Mr. Gray's representation of plaintiffs in personal injury lawsuits. The trial court affirmed the hearing panel's decision. After careful consideration, we too affirm.

**Tenn. Sup. Ct. R. 9, § 33.1(d); Judgment of the Chancery Court Affirmed**

SARAH K. CAMPBELL, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., JEFFREY S. BIVINS, ROGER A. PAGE, and DWIGHT E. TARWATER, JJ., joined.

Lucian T. Pera and John D. Woods III, Memphis, Tennessee, for the appellant, Daryl A. Gray.

James W. Milam, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

**OPINION**

**I. Background**

Daryl A. Gray has been licensed to practice law in Tennessee since 2009. On July 30, 2020, the Board of Professional Responsibility filed a petition for discipline against Mr. Gray alleging that he had violated Rules 1.3, 1.4, 1.15, 1.16, and 4.1 of the Tennessee

Rules of Professional Conduct.[1] These alleged violations were based on two separate complaints filed against Mr. Gray. We discuss the factual circumstances of each complaint below.

## A. The Vincent K. Seiler Complaint

Felisa Jackson was injured in an automobile accident on October 28, 2015. She hired Mr. Gray to represent her in the ensuing personal injury action. To facilitate representation, Mr. Gray and Ms. Jackson executed a "Contract of Employment." The contract stated that Mr. Gray would receive one-third of the recovery if no legal action was filed and forty percent if legal action was taken. The contract also contained a provision explaining that attorney's fees would be calculated based on the total amount recovered, regardless of whether a third-party held a lien against the recovery.

Following her accident, Ms. Jackson received medical treatment from several providers, including Baptist One Care, Campbell Clinic, and a chiropractor named Dr. Alan James. On November 4, 2015, Dr. James had Ms. Jackson sign a "Notice of Doctor's Lien." Mr. Gray signed the document a week later. This agreement gave Dr. James a lien on any money recovered on account of the accident. It also instructed Mr. Gray to "pay directly to [Dr. James] such sums as may be due and owing him for medical service rendered." Although the agreement gave Dr. James a lien, Ms. Jackson remained "directly and fully responsible" to Dr. James for her bills. By the end of her treatment, Ms. Jackson owed nearly $6,000 to Dr. James, $331 to Baptist One Care, and $590 to Campbell Clinic.

Ms. Jackson carried automobile insurance through State Farm. Her policy contained a medical services provision that provided up to $5,000 for medical expenses incurred from an automobile accident. Mr. Gray submitted the bills from Dr. James to State Farm for reimbursement under this provision. State Farm drafted a payment of $1,800 on those bills and intended to send it to Dr. James. Mr. Gray, however, insisted that all payments be sent to his office instead. State Farm eventually paid the full policy amount of $5,000 and sent the check to Mr. Gray's office. Mr. Gray forwarded none of that amount to Dr. James.

Ms. Jackson ultimately settled her personal injury action on June 14, 2016. She and Mr. Gray signed a settlement closing statement. The closing statement listed the total settlement as $19,000, which included $14,000 from the at-fault driver's insurance carrier and $5,000 from State Farm. It also valued Ms. Jackson's medical expenses at $5,658. Dr. James was the only medical provider listed on the agreement, and the agreement indicated that all $5,658 was owed to him. Additionally, the following text appeared at the bottom of the settlement statement:

---

[1] After the Board introduced its proof before the hearing panel, it moved under Tennessee Rule of Civil Procedure 15.02 to conform the petition to the evidence by adding an allegation that Mr. Gray violated Tennessee Rule of Professional Conduct 8.4(c). The hearing panel granted that motion.

> I, Felisa Jackson . . . understand that only those providers listed above have been paid, and I am personally responsible for the payment or reimbursement of any medical expense or other expenses which are not listed above. I authorize and instruct my attorney to disburse the settlement or recovery to any medical provider listed above.

Despite this express authorization and the existence of the doctor's lien, Mr. Gray still did not disburse any of the settlement proceeds to Dr. James.

On July 5, 2016, Dr. James sent Mr. Gray a demand letter. Dr. James enclosed a copy of the doctor's lien and requested that his bills be paid from the settlement proceeds. He also warned that he would submit a bar complaint against Mr. Gray if the bills were not paid within ten days.

Mr. Gray sent a response letter on July 8, 2016. Mr. Gray informed Dr. James that he was unable to pay the bills because "Campbell Clinic Hospital has asserted a claim for $2,450.00 (pending final billing) and BCBS of TB [sic] has asserted a subrogation claim for $(unknown currently) and Baptist One is asserting a claim of $1,331.00 (pending final billing)." At the end of that paragraph, Mr. Gray indicated that these figures "ARE NOT FINAL NUMBERS AND THE AMOUNTS COULD CHANGE."

Mr. Gray's letter also demanded that Dr. James submit his bills to Ms. Jackson's health insurer. Mr. Gray threatened to sue if Dr. James did not, insisting that damages were available for breach of contract and tortious interference of contract. He also alleged that under Tennessee Code Annotated section 29-22-101(b) and (c), Dr. James would recover more from billing insurance than collecting on the doctor's lien. As Mr. Gray put it:

> Under the Tennessee lien statute, the total of all third party medical claims may not exceed 1/3 of the settlement[] (Tenn. Code Ann. § 29-22-101(b) and (c).). Thus, the three hospitals/medical providers claiming liens cannot receive more than a combined total of $4,666.62 from the settlement in satisfaction of their liens and/or interest. According to my calculations, the maximum amount Dr. Alan James . . . can receive on [his] lien claim is therefore $1,750.53. Again, this amount is subject to change as all bills become final.

Dr. James retained attorney Vincent K. Seiler to help him recover from Mr. Gray. In a letter, Mr. Seiler advised Mr. Gray that Tennessee Code Annotated section 29-22-101 did not apply to Dr. James because he was a chiropractor and not an "entit[y] maintaining a hospital." The letter also noted that Dr. James would have submitted his bills to State Farm had Ms. Jackson not instructed him to send them to Mr. Gray instead. Mr. Seiler explained that State Farm had initially sent Dr. James a check for $1,884 but asked him to return it after Mr. Gray requested that State Farm disburse funds to him and Ms. Jackson

instead. Mr. Seiler closed the letter by asking Mr. Gray to produce copies of all bills submitted to State Farm and all payments received from State Farm. Mr. Seiler demanded payment of the outstanding medical bills.

Mr. Gray did not respond to this letter, so Mr. Seiler followed up on August 31, 2016. He explained that State Farm confirmed that it had paid money to Mr. Gray meant to cover Dr. James's medical bills. Mr. Seiler quoted Formal Ethics Opinion No. 2010-F-154 for the proposition that, "[i]f there is no legitimate dispute about who is entitled to all or part of the funds in the attorney's possession, the attorney must disburse the undisputed portion of the funds to the third person as is appropriate." Relying on this point, Mr. Seiler explained that Dr. James was the only provider with an interest in the funds, and that he was therefore entitled to the amount paid by State Farm and any future payments sent for his services. Mr. Seiler threatened to report Mr. Gray to the Board of Professional Responsibility if he did not send Dr. James the funds by September 21, 2016. Mr. Gray did not comply.

On October 3, 2016, Mr. Seiler filed a formal complaint against Mr. Gray with the Board. The complaint alleged that Mr. Gray had violated Rule 1.15 by failing to disburse funds to Dr. James as required by the doctor's lien.

Mr. Gray called the Board on October 20, 2016, for ethics advice regarding the dispute with Dr. James. The Board produced a written summary of this phone call. In the "Facts" section of the summary, the following information appears: "[Mr. Gray] has a case which settled in January. Chiropractor provided services but did not turn payment over to insurance company. Is now seeking payment from the client. Caller is holding funds." The Board advised that "[i]f provider has a right to proceeds and there is [a] dispute by the client the caller must hold funds until [the] dispute is resolved or the caller can pay into the court." The Board's ethics counsel also provided Mr. Gray with a copy of Formal Ethics Opinion 2010-F-154.

In January 2017, Mr. Gray sent letters via certified mail to the medical providers that he believed had interests in the settlement funds. The providers receiving these letters included Dr. James, Baptist One Care, and Campbell Clinic. Only Dr. James replied.

On April 3, 2017, almost ten months after the case settled, Mr. Gray deposited $6,333.00 with the Shelby County Circuit Court and initiated an interpleader action. Mr. Gray served Dr. James, Baptist One Care, and Campbell Clinic with notice of the action. Dr. James filed an answer claiming the interpleaded funds for his medical bills totaling $5,915.00. He also filed a counterclaim for breach of contract and conversion and asked for court costs, attorney's fees, and expenses. No other medical provider, insurer, or third party filed an answer or asserted a claim to the interpleaded funds. The trial court signed an order on January 3, 2019, approving disbursement of the interpleaded funds to Dr. James and Mr. Seiler for the medical bills and attorney's fees.

## B. The Kristopher McMickens Complaint

Kristopher McMickens was injured in an automobile accident on December 3, 2016. He hired Mr. Gray to represent him in a personal injury action against the at-fault driver, Alfred Farmer. Mr. Farmer, however, passed away from crash-related injuries before the suit could be filed. No estate was opened following Mr. Farmer's death, so no personal representative was appointed to accept service of process.

On July 12, 2017, Mr. Gray filed a lawsuit in the Shelby County Circuit Court, styled *Kristopher McMickens v. John Doe, as Administrator of the Estate of Alfred G. Farmer, Deceased*. The summons filed with the complaint was returned as unserved on July 18, 2017. The return of non-service of summons noted that "John Doe is (are) not to be found in this County after diligent search and inquiry for the following reason(s): as he does not exist."

Mr. Gray asked attorney J. Vincent Perryman to petition the Shelby County Probate Court to open a probate estate for Mr. Farmer and appoint Mr. Perryman as Administrator *ad litem* for the sole purpose of acting as a nominal defendant to accept service of process in the tort action. Mr. Perryman agreed to do so. On January 31, 2018, he filed a "Petition to Appoint Administrator Ad Litem for Cause of Action Only" in Shelby County Probate Case No. PR-10506. Later that same day, the Probate Court entered an order appointing Mr. Perryman as Administrator *ad litem* for the sole purpose of serving as a nominal defendant and accepting service of process.

On February 13, 2018, Mr. Gray served the original "John Doe" complaint on Mr. Perryman's secretary. Over the phone, Mr. Perryman authorized the secretary to accept service of process on his behalf. The summons signed by the secretary indicated that Mr. Perryman was the attorney for the unknown "John Doe."

On May 25, 2018, Mr. Gray filed an amended complaint in the McMickens case. This complaint correctly named Mr. Perryman as the Administrator *ad litem* of Mr. Farmer's estate. But Mr. Gray never served the amended complaint on Mr. Perryman or anyone representing him.

Beginning in late 2018, the relationship between Mr. Gray and Mr. McMickens deteriorated. Around that time, Mr. McMickens became extremely hostile with Mr. Gray and his office staff, going so far as to angrily call Mr. Gray's office on several occasions. During these calls, he made clear that he knew Mr. Gray's home address and eventually threatened to kill Mr. Gray along with his family. Mr. McMickens apparently tried to emphasize the seriousness of these threats by referencing his record of being charged with violent crimes. During a text exchange on February 5, 2019, Mr. McMickens told Mr. Gray:

Look I don't know who you think I am I don't need money to make things happen, you won't [sic] to keep yourLaw [sic] firm in Memphis it will be good you do right by me I don't do games, I record conversation to [sic].

Mr. Gray understandably perceived this message as a threat. He responded with a text: "I no longer represent you. Find another attorney."

On March 10, 2019, Mr. Gray followed up with a withdrawal letter to Mr. McMickens. This letter informed him that "we will no longer [be] able to represent you . . . . Accordingly, we will no longer be rendering legal services to you in this matter and will have no further attorney-client relationship." Mr. Gray explained that "a motion for leave to withdraw as counsel" would be filed and Mr. McMickens would have thirty days to "find substitute counsel." He then advised Mr. McMickens that, "[u]pon the court granting our motion, we will immediately cease to provide services to you, and will have no further attorney-client relationship." About a month later, Mr. Gray sent Mr. McMickens a copy of his file. But Mr. Gray did not actually file a motion to withdraw from representing Mr. McMickens.

On June 4, 2019, Mr. Farmer's insurance carrier filed a motion to dismiss the tort action. It argued that there were deficiencies in the service of process and that the statute of limitations had lapsed. The motion was set for a hearing on July 26, 2019.

On June 27, 2019, about four months after he told Mr. McMickens that "I no longer represent you," Mr. Gray finally filed a motion to withdraw. But he did not have the motion docketed for a hearing, so it could not be ruled on.

On July 17, 2019, Mr. Gray sent Mr. McMickens a letter to inform him about the pending motion to dismiss. This letter was sent more than a month after the motion to dismiss was filed and only nine days before it was to be heard. In the letter, Mr. Gray informed Mr. McMickens that:

We have been served with a Motion to Dismiss in your claim. We do not believe this matter will be dismissed but we will keep you a breasted [sic] of this issue as it develops. If you have any questions, feel free to contact me. Thanks.

The letter did not mention that Mr. Gray had filed a motion to withdraw. Mr. Gray filed a response in opposition to the motion to dismiss on July 29, 2019.

On September 18, 2019, the Shelby County Circuit Court dismissed the tort action against the estate of Mr. Farmer. The court's order explained that the original complaint was filed against a non-entity and the amended complaint was never served on anyone. Thus, the statute of limitations barred Mr. McMickens's claim. The Court of Appeals

affirmed that decision. *McMickens v. Perryman* ex rel. *Est. of Farmer*, No. W2022-00445-COA-R3-CV, 2023 WL 3736436 (Tenn. Ct. App. May 31, 2023).

While the motion to withdraw was still pending, Mr. McMickens retained new counsel and filed a legal malpractice action against Mr. Gray. The motion to withdraw was finally granted on January 24, 2022, nearly three years after Mr. Gray told Mr. McMickens that he no longer represented him.

### C. Hearing Panel's Judgment

The hearing panel issued its written judgment on June 24, 2022. It concluded that Mr. Gray had violated six Rules of Professional Conduct: Rule 1.15(d) and (e) (Safekeeping Property and Funds); Rule 4.1(a) (Truthfulness in Statements to Others); Rule 1.3 (Diligence); Rule 1.16 (Declining or Terminating Representation); Rule 1.4 (Communication); and Rule 8.4(c) (Misconduct).

The hearing panel also determined that the baseline sanction should be suspension based on American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards") 4.12, 4.42, 4.62, 6.12, and 7.2.[2] The hearing panel then considered aggravating and mitigating factors to determine the appropriate length for the suspension. The panel considered as aggravating factors: (1) Mr. Gray's dishonest or selfish motive; (2) his refusal to acknowledge the wrongful nature of his conduct; (3) his substantial experience in the practice of law; and (4) the vulnerability of Mr. McMickens. The hearing panel identified no mitigating factors.

Based on that analysis, the hearing panel recommended a six-month suspension, with two months served in active suspension. The rest of the suspension would be served on probation. During the probationary period, Mr. Gray would be required to meet with a practice monitor monthly. The panel also required that Mr. Gray complete six additional hours of law office management and ethics CLE. It further required him to pay for the costs of the proceeding.

### D. Trial Court Proceedings

Mr. Gray timely filed a petition for review of the hearing panel's decision in the Shelby County Chancery Court. On appeal, he argued that the hearing panel's conclusions regarding the Jackson and McMickens matters were arbitrary or capricious and

---

[2] The hearing panel also found ABA Standards 4.43, 6.13 and 7.3 applicable. Those standards recommend reprimand as the appropriate sanction.

unsupported by substantial and material evidence. He also argued that the hearing panel abused its discretion by imposing an excessive sanction.

The trial court rejected those arguments and affirmed the hearing panel's judgment. After reviewing the record, it concluded that the hearing panel's decisions regarding the Jackson and McMickens matters were supported by substantial and material evidence and were not arbitrary or capricious. It also determined that the hearing panel did not abuse its discretion by recommending a six-month suspension.

## II. Standard of Review

The Tennessee Supreme Court is the final arbiter of the professional conduct of all lawyers practicing in Tennessee. *Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 612 (Tenn. 2010). Attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which determines whether a violation has occurred, and if so, the appropriate sanction for the violation. *Bd. of Pro. Resp. v. Daniel*, 549 S.W.3d 90, 99 (Tenn. 2018) (citing *Maddux v. Bd. of Pro. Resp.*, 409 S.W.3d 613, 621 (Tenn. 2013)).

Either party may appeal the hearing panel's decision to the circuit or chancery court, where review is based on "the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 33.1(b). A party may then appeal to this Court. *Id.* § 33.1(d). This Court examines "the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel." *Id.* We apply the same standard of review as the trial court. *Daniel*, 549 S.W.3d at 100. Under that standard of review, we may reverse or modify a hearing panel's judgment only if we conclude that the hearing panel's findings, inferences, conclusions, or decisions are:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

*Id.* (citing Tenn. Sup. Ct. R. 9, § 33.1(b)).

We review questions of law de novo but do not substitute our judgment for that of the hearing panel as to the weight of the evidence on questions of fact. *Id.* (citing *Maddux*, 409 S.W.3d at 622); *see also* Tenn. Sup. Ct. R. 9, § 33.1(b).

We review attorney disciplinary appeals as part of our inherent power to promulgate and enforce disciplinary rules. *See Hughes v. Bd. of Pro. Resp.*, 259 S.W.3d 631, 647 (Tenn. 2008). Our review seeks to ensure that these rules are enforced in a manner that preserves both the integrity of the bar and the public trust in our system of justice. *See id.*

## III. Analysis

On appeal, Mr. Gray challenges the hearing panel's findings that he violated Tennessee Rules of Professional Conduct 1.15(d) and (e) (Safekeeping Property and Funds); 4.1(a) (Truthfulness in Statements to Others); 1.16 (Declining or Terminating Representation); 1.3 (Diligence); 1.4 (Communication); and 8.4(c) (Misconduct). He also challenges the hearing panel's recommended punishment.

We first consider Mr. Gray's arguments concerning rule violations and then turn to his argument about the recommended punishment.

### A. Rule Violations

Mr. Gray first argues that the hearing panel's conclusions that he violated the Rules of Professional Conduct should be reversed because they were not supported by substantial and material evidence, were arbitrary and capricious, or constituted abuse of discretion.

In "applying the substantial and material evidence test, it is our duty to determine whether the 'decision is supported by such relevant evidence as a rational mind might accept to support a rational conclusion.'" *Bd. of Pro. Resp. v. Allison*, 284 S.W.3d 316, 322 (Tenn. 2009) (quoting *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316–17 (Tenn. 2007)). We consider whether the record contains a "reasonably sound factual basis" for the hearing panel's decision. *Hoover v. Bd. of Pro. Resp.*, 395 S.W.3d 95, 103 (Tenn. 2012) (quoting *Hughes*, 259 S.W.3d at 641). A reasonably sound basis is less than a preponderance of the evidence but "more than a scintilla or glimmer." *Allison*, 284 S.W.3d at 322 (quoting *Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002)). When "reasonable minds can disagree over the propriety of a hearing panel's decision, we will uphold the ruling." *Dunlap v. Bd. of Pro. Resp.*, 595 S.W.3d 593, 607 (Tenn. 2020) (quoting *Bd. of Pro. Resp. v. Sheppard*, 556 S.W.3d 139, 146 (Tenn. 2018)).

"A hearing panel's decision is arbitrary or capricious when 'it is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (alteration in original) (quoting *Hughes*, 259 S.W.3d at 641). "A hearing panel abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (cleaned up).

### 1. Rule of Professional Conduct 1.15(d) and (e)

Rule of Professional Conduct 1.15(d) provides that "[u]pon receiving funds or other property in which a client or third person has an interest . . . a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is

entitled to receive." Tenn. Sup. Ct. R. 8, RPC 1.15(d). Under Rule of Professional Conduct 1.15(e), "[w]hen in the course of representation a lawyer is in possession of property or funds in which two or more persons . . . claim interests, the property shall be kept separate by the lawyer until the dispute is resolved." Tenn. Sup. Ct. R. 8, RPC 1.15(e). Subsection (e) further provides that "[t]he lawyer shall promptly distribute all portions of the property or funds as to which the interests are not in dispute." *Id.*

The hearing panel concluded that Mr. Gray violated Rule 1.15(d) and (e) while representing Ms. Jackson. The hearing panel found that Mr. Gray "never had any legal basis for not immediately making full payment on Dr. James' executed lien" because there was no legitimate dispute as to the funds. And it determined that Mr. Gray's argument about Tennessee Code Annotated section 29-22-101(b) was unfounded because there was "no legal basis for the assertion that this statute is applicable here."

Mr. Gray contends that the hearing panel "erroneously conflat[ed] the concept of the *existence* of a valid claim or interest" with "a party *asserting* a valid claim or interest." In his view, the hearing panel's reasoning incorrectly "rests on the assumption that no other party possessed a valid claim or interest because no other party asserted it by letter or written notice."

Mr. Gray misunderstands the hearing panel's reasoning. In concluding that Mr. Gray lacked a legal basis for withholding the funds, the hearing panel found that "no other medical provider other than Dr. James . . . actually held a lien at any time as to any settlement funds." The problem for Mr. Gray was not merely that no other medical provider had *asserted* a claim. Rather, it was that no other medical provider possessed a claim that triggered Mr. Gray's duty to withhold payment under Rule 1.15(c).

Formal Ethics Opinion 2010-F-154 addresses the circumstances in which an attorney is obligated to withhold disputed funds under Rule 1.15(c). That opinion examines Comment 11 to Rule 1.15, which provides as follows:

> Third parties, such as a client's creditors, may have *just claims* against funds or other property in a lawyer's custody. A lawyer may have a duty *under applicable law* to protect such third-party claims against wrongful interference by the client and accordingly may refuse to surrender the funds or other property to the client.

Tenn. Sup. Ct. R. 8, RPC 1.15, cmt. 11 (emphasis added). The ethics opinion explains that the terms "just claim" and "applicable law" in this comment have been interpreted to mean that "the only type of third party 'interest' which the attorney should preserve for a third person is a matured legal or equitable lien on the disputed funds or interest." Tenn. Formal Ethics Op. 2010-F-154, 2010 WL 3767993, at *2 (Sept. 10, 2010). The opinion concludes that:

RPC 1.15(c) obligates an attorney to pay the settlement funds to the third person or to safeguard the funds until the dispute is resolved if one of the following exist: (1) an attachment or garnishment arising out of a valid judgment relating to disposition of the funds; (2) a valid and perfected statutory, contractual or judgment lien against the property; (3) a letter of protection or similar obligation specifically entered into to aid in obtaining the funds; (4) a written assignment or authorization signed by the client, counsel, or other individual with authority conveying interest in the funds to the third person or entity; or (5) a court order relating to the funds in the attorney's possession.

*Id.* at *3.

This conclusion is consistent with ethics opinions and case law from other jurisdictions. *See, e.g.*, R.I. Ethics Op. 2007-02 (2007); Ohio Ethics Op. 2007-7 (2007); Pa. Ethics Op. 2003-4 (2003); Utah Ethics Op. 00-04 (2000); D.C. Ethics Op. 293 (1999); Ariz. Ethics Op. 98-06 (1998); *In re Bailey*, 883 A.2d 106, 116–17 (D.C. 2005). It is also consistent with the *Restatement (Third) of the Law Governing Lawyers*: "If a lawyer holds property belonging to one person and a second person has a contractual or similar claim against that person but does not claim to own the property or have a security interest on it, the lawyer is free to deliver the property to the person to whom it belongs." Restatement (Third) of the Law Governing Lawyers § 45 cmt. d (Am. L. Inst. 2000).

We agree with Formal Ethics Opinion 2010-F-154 that only a "matured legal or equitable lien on the disputed funds" is sufficient to trigger a lawyer's obligation to withhold payment of disputed funds under Rule 1.15. Tenn. Formal Ethics Op. 2010-F-154, 2010 WL 3767993, at *2. A lawyer's knowledge that a third party has a general unsecured debt is not sufficient to create a "dispute" under Rule 1.15.

Given this holding, we have little trouble concluding that substantial and material evidence supported the hearing panel's finding that Mr. Gray violated Rule 1.15(d) and (e) by withholding payment from Dr. James. The "Notice of Doctor's Lien" signed by Mr. Gray and Ms. Jackson gave Dr. James a lien on the settlement proceeds, and the settlement closing statement specifically authorized Mr. Gray to pay Dr. James from the settlement proceeds. Dr. James therefore had an "interest" in the settlement proceeds and was "entitled to receive" the amount owed to him. *See* Tenn. Sup. Ct. R. 8, RPC 1.15(c). No other medical provider had a mature equitable or legal lien on the settlement proceeds. Indeed, no other medical provider had requested payment from Mr. Gray. This evidence amply supports the hearing panel's conclusion that there was no legitimate dispute to the settlement proceeds that required Mr. Gray to withhold payment from Dr. James. We therefore affirm the hearing panel's determination that Mr. Gray violated Rule 1.15(d) and (e), as it was supported by substantial and material evidence and neither arbitrary and capricious nor an abuse of discretion.

## 2. Rule of Professional Conduct 4.1(a)

Rule of Professional Conduct 4.1(a) prohibits a lawyer from "knowingly mak[ing] a false statement of material fact or law to a third person." Tenn. Sup. Ct. R. 8, RPC 4.1(a). The comments explain that a lawyer may violate this Rule by making "partially true but misleading statements or omissions that are the equivalent of affirmative false statements." *Id.* cmt. 1.

The hearing panel concluded that Mr. Gray made "knowing and intentional false statements" to Dr. James. Specifically, Mr. Gray made false statements when he stated in his July 8, 2016, letter to Dr. James that other providers had "asserted" claims to the settlement funds in specific monetary amounts and that Dr. James's recovery would be limited by Tennessee Code Annotated section 29-22-101.

Mr. Gray insists that these statements were not false because his letter explicitly stated that these purported third-party claims were "not final numbers" and "the amounts could change." Alternatively, he argues that even if his statements were technically false, they were not made "knowingly." Rather, he asserts that he had a "good faith belief" that his knowledge of third-party medical bills obligated him to investigate the existence of those claims.

The record in this case contains substantial and material evidence to support the hearing panel's conclusion that Mr. Gray made false statements of fact or law to Dr. James. Following her automobile accident, Ms. Jackson received medical treatment from several providers, including Dr. James, Campbell Clinic, and Baptist One Care. Dr. James, however, was the only provider who possessed a doctor's lien to secure payment from the personal injury settlement. Moreover, Dr. James was the only provider who made a written request of any kind for the remission of funds.

Nevertheless, Mr. Gray told Dr. James that "Campbell Clinic Hospital has asserted a claim for $2,450.00 (pending final billing), and BCBS of TB [sic] has asserted a subrogation claim for $(unknown currently) and Baptist One is asserting a claim of $1,331.00 (pending final billing)." These were all false statements of fact, as no third party—other than Dr. James—ever asserted a claim against the settlement proceeds. Gray also told Dr. James that his recovery under the doctor's lien would be limited by Tennessee Code Annotated section 29-22-101. This was a false statement of law, because that statute applies only to entities "maintaining a hospital" in Tennessee. Dr. James is a chiropractor, and he does not maintain a hospital in the state.

Mr. Gray's argument about the qualifying language in his letter is largely beside the point. That language indicated only that the claim *amounts* might change; it did not in any way qualify his statement that other providers had asserted claims. Mr. Gray's statements were false because he erroneously indicated that other providers had asserted claims, not

because the specific amounts listed were erroneous. His caveat that the amounts were "not final numbers" is thus irrelevant.

Substantial and material evidence also supports the hearing panel's finding that Mr. Gray's false statements were made knowingly because he had no good faith basis for believing that other providers or insurers had asserted claims to the settlement funds. Dr. James was the only provider to request remission of the settlement funds. This evidence was sufficient to support an inference that Mr. Gray knew that no other provider had "asserted" a claim to the settlement funds at the time he sent the letter. Even if Mr. Gray had a "good faith belief" that Ms. Jackson had medical bills from providers other than Dr. James, he had no basis for stating that those providers had asserted claims against the settlement proceeds.

The hearing panel's conclusion that Mr. Gray violated Rule 4.1(a) is supported by substantial and material evidence and was neither arbitrary and capricious nor an abuse of discretion.

### 3. Rule of Professional Conduct 1.16

Rule of Professional Conduct 1.16 provides that a "lawyer who is discharged by a client, or withdraws from representation of a client, shall, to the extent reasonably practicable, take steps to protect the client's interests." Tenn. Sup. Ct. R. 8, RPC 1.16(d). The necessary steps may include, among others: "(1) giving reasonable notice to the client; (2) allowing time for the employment of other counsel; (3) cooperating with any successor counsel engaged by the client; [and] (4) promptly surrendering papers and property to which the client is entitled . . . ." *Id.*; *see also Bd. of Pro. Resp. v. Prewitt*, 647 S.W.3d 357, 376–77 (Tenn. 2022).

The hearing panel concluded that Mr. Gray violated Rule 1.16 during his withdrawal from representing Mr. McMickens. The panel explained that Mr. Gray "inaccurately informed Mr. McMickens [that] he no longer represented him in February 2019, and then after eventually filing a Motion to Withdraw in June 2019 failed to set the Motion for hearing, thus remaining counsel of record almost three (3) full years after notifying his client of the withdrawal." The hearing panel also noted that Mr. Gray continued to give legal advice to Mr. McMickens during this three-year period, "which is certain to send a mixed message to the average client."

Mr. Gray argues that he complied with Rule 1.16 because his "I no longer represent you" text gave Mr. McMickens reasonable notice, and he promptly sent Mr. McMickens a copy of his file. He also contends that he continued giving Mr. McMickens legal advice after the withdrawal text because he was taking steps to protect his client's interest as required by Rule 1.16.

The record shows that Mr. Gray texted Mr. McMickens in February of 2019. This text message said "I no longer represent you. Find another attorney." Gray then waited four months to file a motion to withdraw, but he did not request a hearing on the motion. As a result, the motion remained pending for almost three years before it was granted. During this three-year period, Mr. Gray performed legal work for Mr. McMickens by discussing a settlement offer with him and filing an opposition to the motion to dismiss.

Mr. Gray's behavior left Mr. McMickens in the lurch. Mr. Gray told his client that their relationship was over but failed to formally withdraw for almost three years. We recognize that Mr. Gray continued to perform legal work for Mr. McMickens, but we disagree that this conduct adequately protected his interests. The fact that Mr. Gray mitigated some of the harm his delay caused to Mr. McMickens does not absolve him of the harm that remained. In fact, because the kind of sporadic representation provided by Mr. Gray can dissuade a client from seeking new counsel, it tends to hurt clients like Mr. McMickens more than it helps them.

To adequately protect his client's interests, Mr. Gray should have promptly withdrawn from representation after informing Mr. McMickens that he no longer represented him. That course of action would have made clear to Mr. McMickens that he needed to retain new counsel. His new counsel, in turn, may have identified and corrected the procedural defects before the statute of limitations lapsed. Instead, Mr. Gray's mixed signals and substantial delay in withdrawing from the case deprived Mr. McMickens of that opportunity.

For all of these reasons, the hearing panel's conclusion that Mr. Gray violated Rule 1.16 is supported by substantial and material evidence and is neither arbitrary and capricious nor an abuse of discretion.

### 4. Rule of Professional Conduct 1.3

Rule of Professional Conduct 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Tenn. Sup. Ct. R. 8, RPC 1.3. To satisfy this rule, a lawyer must "pursue the client's best interests and . . . take care not to place the client in a vulnerable position or unnecessarily expose the client to sanctions." *Mabry v. Bd. of Pro. Resp.*, 458 S.W.3d 900, 910 (Tenn. 2014).

The hearing panel concluded that Mr. Gray violated Rule 1.3 during his representation of Mr. McMickens. In support of this conclusion, it emphasized Mr. Gray's failure to properly file and serve Mr. McMickens's complaint:

> [Mr. Gray] prematurely filed the Complaint prior to an administrator being named, improperly attempted to file the complaint against an unidentified "John Doe," failed to properly serve Mr. Perryman once he was appointed

Administrator and, even then the only document ever served was the initial Complaint, which was a legal nullity because it named a non-existent entity as Defendant. Further, the Amended Complaint is replete with errors, including naming parties as Defendants who had no involvement in the matter, and was never served upon any party.

The hearing panel noted that "[t]his lack of diligence led to the Court's determination that the statute of limitations lapsed and ultimate dismissal of the action."

Mr. Gray contends that his initial complaint was neither "premature" nor "improper." He asserts that Tennessee law "clearly contemplates that in order to appoint an administrator *ad litem* an action must *already be pending*." To support this argument, he quotes the language of Tennessee Code Annotated section 30-1-109(a). This statute, in pertinent part, provides that: "[I]n all proceedings . . . where the estate of a deceased person must be represented, and there is no executor or administrator of the estate . . . it shall be the duty of the judge or chancellor of the court . . . to appoint an administrator ad litem of the estate." Tenn. Code Ann. § 30-1-109(a) (2021).

Mr. Gray's argument is meritless. Tennessee law provides that "[i]n all cases where a person commits a tortious or wrongful act . . . and the person committing the wrongful act dies before suit is instituted to recover damages, . . . the cause of action shall survive and may be prosecuted *against the personal representative* of the tort-feasor or wrongdoer." Tenn. Code Ann. § 20-5-103(a) (2021) (emphasis added). Importantly, this Court has explained that "an action preserved by this section may *only* be instituted against the personal representative of the tort-feasor." *Goss v. Hutchins*, 751 S.W.2d 821, 824 (Tenn. 1988) (emphasis added). Thus, "[a] personal representative of a deceased tortfeasor must exist before a right of action for tort is ripe for enforcement." *Est. of Russell v. Snow*, 829 S.W.2d 136, 137 (Tenn. 1992). If "there is no personal representative of the deceased tort-feasor upon whom process can be served, the plaintiff is entitled to have appointed an administrator *ad litem* pursuant to T.C.A. § 30-1-109." *Id.*

Given these precedents, there is no question that Mr. Gray's initial lawsuit was both "premature" and "improper." He filed the lawsuit against "John Doe" rather than the personal representative of Mr. Farmer's estate, even though Tennessee law is clear that a lawsuit cannot be filed until *after* a personal representative is appointed.

Mr. Gray also tries to relitigate the trial court's decision to dismiss Mr. McMickens's case. He believes the trial court's decision to dismiss was predicated on the conclusion that Mr. Gray failed to properly serve the initial complaint. Mr. Gray argues that this conclusion was wrong and insists that service of the initial complaint was proper because it was served on Mr. Perryman's secretary, who was authorized to accept it.

But whether Mr. Perryman's secretary was properly served is irrelevant. She was served with the initial "John Doe" complaint, which was void because it was filed against a non-entity. Even if service had been proper, the void complaint could not initiate a legal action. The initial complaint thus had no effect on the statute of limitations. Mr. McMickens's case was dismissed because of Mr. Gray's failure to serve the *amended* complaint on Mr. Perryman, not because of defects in service of the initial complaint.

Evidence that Mr. Gray filed the initial complaint against a non-entity and failed to serve Mr. Perryman with the amended complaint provides a reasonably sound factual basis for the hearing panel's conclusion that Mr. Gray violated Rule 1.3. That conclusion is supported by substantial and material evidence and is neither arbitrary and capricious nor an abuse of discretion.

### 5. Rule of Professional Conduct 1.4

Rule of Professional Conduct 1.4(a) provides that a lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in RPC 1.0(e), is required by these Rules;

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter;

(4) promptly comply with reasonable requests for information; and

(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

Tenn. Sup. Ct. R. 8, RPC 1.4(a). Rule 1.4(b) supplements these examples, stating that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *Id.*, RPC 1.4(b).

The hearing panel concluded that Mr. Gray violated Rule 1.4 during his representation of Mr. McMickens. It determined that Mr. Gray:

[F]ailed to keep Mr. McMickens informed of the progress of his case, failed to reasonably consult with his client as to the Motion to Dismiss, failed to properly advise his client as to the potential consequences of loss of the dispositive motion, and failed to promptly respond to his client's requests for information.

It also noted that Mr. Gray "failed to communicate accurately the state of his representation of Mr. McMickens."

Although Mr. Gray maintains that he adequately communicated with his client throughout the case, we find substantial and material evidence to support the hearing panel's conclusion. The record contains no evidence that Mr. Gray ever seriously consulted Mr. McMickens about the latter's objectives and how to achieve them. In fact, most of their conversations spanning five years of representation were sporadic and brief discussions about settlement offers.

The communication between Mr. Gray and his client deteriorated even further following his "I no longer represent you" text message in February 2019. When this message was sent, Mr. Gray was—and continued to be—the attorney of record on Mr. McMickens's case. Thus, Mr. Gray misrepresented the status of his representation to Mr. McMickens. Mr. Gray also waited over a month to inform Mr. McMickens that a motion to dismiss had been filed in his case. And when Mr. Gray finally sent a letter about it, he underplayed the seriousness of the motion by claiming that "[w]e do not believe the matter will be dismissed." These communication lapses deprived Mr. McMickens of the opportunity to make informed decisions about his case.

It follows that the hearing panel's conclusion that Mr. Gray violated Rule 1.4 is supported by substantial and material evidence and is neither arbitrary and capricious nor an abuse of discretion.

### 6. Rule of Professional Conduct 8.4(c)

Rule of Professional Conduct 8.4(c) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Tenn. Sup. Ct. Rule 8, RPC 8.4(c). The hearing panel found that Mr. Gray violated Rule 8.4(c) during his representation of Mr. McMickens. Specifically, it determined that Mr. Gray's text stating that "I no longer represent you" amounted to "conduct involving dishonesty, fraud, deceit, or misrepresentation."

Mr. Gray argues that this text was sent after Mr. McMickens had made repeated threats, and it was therefore a statement reflecting his intent to withdraw rather than a statement of "absolute, present fact." We disagree. Although Mr. Gray had good reasons to withdraw from representation given Mr. McMickens's threats, his text message—"I no longer represent you"—was a statement of present fact, not future intent. A reasonable person would interpret this statement to mean that the attorney-client relationship had already ended. That is especially true when the client, like Mr. McMickens, is unfamiliar with legal procedure and the ethical obligations of attorneys. Because Mr. Gray remained Mr. McMickens's attorney when the text message was sent, substantial and material

evidence supports the hearing panel's conclusion that Mr. Gray violated Rule 8.4(c). Moreover, that conclusion was neither arbitrary and capricious nor an abuse of discretion.

## B. Recommended Punishment

To determine the appropriate sanction for attorney misconduct, a hearing panel must consider the applicable ABA Standards. Tenn. Sup. Ct. R. 9, § 15.4(a). The hearing panel "first identifies the presumptive sanction under the ABA Standards and then considers whether the presumptive sanction should be increased or decreased based on aggravating and mitigating factors." *Dunlap v. Bd. of Pro. Resp.*, 595 S.W.3d 593, 612 (Tenn. 2020).

The hearing panel identified ABA Standards 4.12, 4.42, 4.43, 4.62, 6.12, 6.13, 7.2, and 7.3 as applicable. Five of those standards—ABA Standards 4.12, 4.42, 4.62, 6.12, and 7.2—recommend suspension as the appropriate sanction. The hearing panel considered four aggravating factors: (1) Mr. Gray's dishonest or selfish motive; (2) his refusal to acknowledge the wrongful nature of his conduct; (3) his substantial experience in the practice of law, having been licensed since 2009; and (4) the vulnerability of Mr. McMickens. It found no applicable mitigating factors. The hearing panel concluded that Mr. Gray should receive a six-month suspension with two months active and the remainder on probation.

Mr. Gray contends that his six-month suspension is excessively punitive because the hearing panel inappropriately applied the ABA Standards and failed to consider appropriate mitigating circumstances. We address each of his arguments below.

### *1. Presumptive Sanction*

Mr. Gray contends that the hearing panel erred by finding suspension to be the presumptive sanction under the ABA Standards. Mr. Gray challenges the panel's reliance on ABA Standards 4.12, 4.62, 6.12, 4.42, and 7.2. We consider each standard in turn. Although we agree with Mr. Gray that the hearing panel's analysis was flawed in certain respects, we conclude that its recommended sanction is nevertheless appropriate.

***ABA Standard 4.12.*** ABA Standard 4.12 states that "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." Mr. Gray argues that there is no evidence in the record showing that he caused any injury or potential injury to Ms. Jackson.

We disagree. Under ABA Standard 4.12, suspension is appropriate when the lawyer's misconduct causes either injury or *potential injury*. Although there is no evidence that Mr. Gray actually injured Ms. Jackson, his failure to promptly disburse the funds at least exposed Ms. Jackson to potential injury. A "potential" injury is one that is capable of occurring. *See Potential*, Black's Law Dictionary 1413 (11th ed. 2019) (defining the

adjective "potential" as "[c]apable of coming into being; possible if the necessary conditions exist"). Because Ms. Jackson remained "directly and fully responsible" to Dr. James for her medical bills under the doctor's lien, Mr. Gray's failure to promptly disburse the funds created the possibility that Dr. James could have sought payment from Ms. Jackson instead. Had he done so, Ms. Jackson would have suffered financial harm. Given this potential injury, the hearing panel appropriately relied on ABA Standard 4.12 in determining Mr. Gray's sanction.

***ABA Standard 4.62.*** ABA Standard 4.62 states that "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." Mr. Gray argues that there is no evidence that he "'knowingly deceiv[ed]' anyone, let alone a client." He also asserts that Ms. Jackson "was not harmed and neither was Dr. James."

Although we agree with Mr. Gray that he did not knowingly deceive or injure Ms. Jackson, we nevertheless conclude that ABA Standard 4.62 applies based on Mr. Gray's false statement to Mr. McMickens. Mr. Gray's July 8, 2016 letter to Dr. James, in which he falsely stated that other medical providers had asserted claims for payment, does not warrant application of ABA Standard 4.62 because the false statements at issue were made to a third party rather than his client. But Mr. Gray made a false statement to his client, Mr. McMickens, when he told him he no longer represented him. The hearing panel correctly found that this statement "was conduct involving dishonesty, fraud, deceit, or misrepresentation" that harmed Mr. Gray's client. Accordingly, the hearing panel's application of ABA Standard 4.62 was proper.

***ABA Standard 6.12.*** ABA Standard 6.12 states that "[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld." The hearing panel's reliance on this standard was improper. Mr. Gray made false statements during his representation of Ms. Jackson and Mr. McMickens, but these statements were not submitted "to the court." Instead, the statements were made to a third party and a client.[3]

***ABA Standard 4.42.*** ABA Standard 4.42 states that "[s]uspension is generally appropriate when: (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client, or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client." Mr. Gray argues that this standard is inapplicable because there is no evidence in the record that he acted "knowingly."

---

[3] Mr. Gray also challenges the hearing panel's reliance on ABA Standard 6.13, which does not require that the false statement or material omission be made to a court. But because the presumptive sanction under ABA Standard 6.13 is a reprimand rather than suspension—and we conclude that suspension was appropriate—we need not address that argument.

We disagree. Whether or not Mr. Gray acted "knowingly," there is substantial evidence that he "engaged in a pattern of neglect that caus[ed] injury" to Mr. McMickens. Mr. Gray's failure to properly file the initial complaint and his failure to serve the amended complaint constitutes a pattern of neglect. And this neglect led to the dismissal of Mr. McMickens's case on procedural grounds. That dismissal injured Mr. McMickens. ABA Standard 4.42 applies here and provides that suspension is the appropriate sanction.

***ABA Standard 7.2.*** ABA Standard 7.2 states that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." Mr. Gray argues that "there was no testimony elicited that [he] knowingly violated any Rule of Professional Conduct or duty."

As explained above, substantial and material evidence supports the hearing panel's conclusion that Mr. Gray knowingly made a false statement to Mr. McMickens when he said he no longer represented Mr. McMickens. That false statement harmed Mr. McMickens by creating confusion about the status of his relationship with Mr. Gray and delaying his ability to obtain a new attorney. The hearing panel thus properly relied on ABA Standard 7.2 to find that suspension is the presumptive baseline sanction.

Although the hearing panel improperly relied on ABA Standard 6.12 to find that suspension is the appropriate sanction, that error was harmless. The ABA Standards provide that "[t]he ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations." *Preface to* Standards for Imposing Lawyer Sanctions (Am. Bar Ass'n 2019). Because ABA Standards 4.12, 4.42, 4.62, and 7.2 independently call for suspension, the hearing panel's conclusion that Mr. Gray's conduct warrants suspension remains sound.

### 2. Aggravating and Mitigating Factors

Mr. Gray challenges the hearing panel's consideration of aggravating and mitigating factors in two respects. First, he argues that the hearing panel erred in applying the "dishonest or selfish motive" aggravating factor because there was no finding that Mr. Gray acted with a particular selfish motive. Second, Mr. Gray contends that the hearing panel should have considered as a mitigating factor that he submitted his ethical inquiry in the Ms. Jackson matter to the Board for guidance and followed the informal opinion's directive.

As for the first argument, we conclude that the hearing panel's determination that Mr. Gray had a "dishonest or selfish motive" was supported by substantial and material evidence. Evidence of an attorney's motive may be entirely circumstantial. *Cf. State v. Dorantes*, 331 S.W.3d 370, 389 (Tenn. 2011) (explaining that evidence sufficient to support a criminal conviction may be "entirely circumstantial"). Here, the only rational

explanation for Mr. Gray's decision to withhold payment from Dr. James under the circumstances was to increase the amount of the settlement retained by Ms. Jackson. Although Mr. Gray's attorney's fees under his contract with Ms. Jackson were to be calculated independent of any liens on the settlement, a larger settlement for his client still would have benefited Mr. Gray by making it easier to collect his attorney's fees. Evidence that Mr. Gray pressed Dr. James to submit his claims to Ms. Jackson's health insurer further supports the hearing panel's finding of a dishonest and selfish motive, because those expenses had already been reimbursed by State Farm.

With respect to the alleged mitigating factor, we conclude that the hearing panel properly disregarded Mr. Gray's discussion with the Board's ethics counsel. To be sure, Mr. Gray contacted ethics counsel. But he omitted critical facts during that discussion by failing to mention the doctor's lien or the settlement closing agreement. Moreover, the Board's ethics counsel provided him with a copy of Formal Ethics Opinion 2010-F-154. Had Mr. Gray carefully reviewed that opinion, he would have learned that there was no legitimate dispute as to the settlement funds and that withholding payment from Dr. James was unnecessary. We do not generally reward those who use misrepresentation to exact a legal advantage. *See, e.g.*, *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 462–63 (Tenn. 2012) (denying a defendant's ability to raise the statute of limitations as a defense where "the defendant . . . failed to disclose material facts . . . despite a duty to do so").

### 3. Appropriateness of Sanction

The hearing panel recommended that Mr. Gray receive a six-month suspension, with two months to be served on active suspension and the rest on probation. Under our Rules, the period of suspension for an attorney must be more than thirty days but less than ten years. Tenn. Sup. Ct. R. 9, § 12.2(a)(2). Additionally, the ABA recommends a minimum suspension of six months. ABA Standard 2.3. As four aggravating circumstances weigh against Mr. Gray and no mitigating factors support him, the hearing panel's recommended sanction appears to be an appropriate punishment.

Sanctions aim to deter misconduct without overburdening the ethical practice of law. *See In re Cope*, 549 S.W.3d 71, 76–77 (Tenn. 2018) (quoting *Hornbeck v. Bd. of Pro. Resp.*, 545 S.W.3d 386, 396–97 (Tenn. 2018)) (noting that attorney discipline's "purpose is to safeguard the administration of justice, protect the public from the misconduct or unfitness of members of the legal profession, and preserve the confidence of the public in the integrity and trustworthiness of lawyers in general"). Given this aim, whether sanctions are appropriate will often depend on the specific misconduct for which a lawyer is being disciplined, as well as the lawyer's own character.

Here, the six-month suspension is an appropriate sanction given the seriousness of Mr. Gray's misconduct. The first part of the sanction is a two-month active suspension,

during which Mr. Gray will not be allowed to practice law in Tennessee and must satisfy additional continuing legal education requirements. The second part is a four-month probationary period, during which he must meet regularly with a practice monitor.

Too short a period of active suspension will not go far enough to deter attorney misconduct, while too long of one can become the practical equivalent of disbarment. *See* Stephen G. Bené, Note, *Why Not Fine Attorneys?: An Economic Approach to Lawyer Disciplinary Sanctions*, 43 Stan. L. Rev. 907, 929 (1991) ("As far as the attorney is concerned, any suspension over a year or two in length may be the same to him as outright disbarment, since he will have to find another occupation to support himself."). In this case, the period of active suspension falls comfortably between those two extremes. This strikes the balance necessary to deter other lawyers from engaging in a similar pattern of misconduct.

After those two months, Mr. Gray will be able to return to the practice of law subject to oversight by a practice monitor. Though this probationary period remains a "suspension," its main purpose is to rehabilitate rather than to discipline. *See* Tenn. Sup. Ct. R. 9, § 14.1 ("Probation shall be used only in cases where there is little likelihood that the respondent attorney will harm the public during the period of rehabilitation and where the conditions of probation can be adequately supervised."). Four months with a practice monitor is an appropriate amount of time for Mr. Gray to demonstrate that he is unlikely to engage in further misconduct. This four-month probationary period, in turn, combines with the two-month active suspension to form a single sanction reasonably aimed at stopping future misconduct by Mr. Gray and others.

This conclusion comports with this Court's review of similar sanctions in previous cases. In *Patty v. Board of Professional Responsibility*, for example, we held that a four-month active suspension was appropriate where a lawyer willfully violated an agreed order and pursued frivolous claims that resulted in sanctions. 90 S.W.3d 641, 642–44 (Tenn. 2002). The hearing panel in *Patty* found one aggravating factor—that the lawyer had been the subject of prior disciplinary proceedings. *Id.* at 644. We observed, however, that the one-year active suspension originally proposed by the hearing panel would have been appropriate had the lawyer not already been sanctioned for pursuing frivolous claims by the courts in which they had been raised. *Id.* at 645–46. In another case, *Walwyn v. Board of Professional Responsibility*, we held that a thirty-day active suspension with a five-month probationary period was appropriate for a lawyer who repeatedly failed to timely file transcripts and briefs and disobeyed court orders during his representation of clients on appeal. 481 S.W.3d 151, 153–54 (Tenn. 2015). Although we affirmed the sanction due to the hearing panel's consideration of four mitigating factors, we noted that the sanction was "more lenient . . . than could be sustained under the proof in the record." *Id.* at 168. Indeed, we have typically reserved such short suspensions for negligent misconduct and situations in which there are important mitigating factors. *See, e.g.*, *Maddux v. Bd. of Pro. Resp.*, 288

S.W.3d 340, 348–49 (Tenn. 2009); *Allison*, 284 S.W.3d at 327–28; *Sneed v. Bd. of Pro. Resp.*, 37 S.W.3d 886, 890–91 (Tenn. 2000).

Neither *Patty* nor *Walwyn* is on all fours with this case, but the conduct at issue here is comparable in severity to both cases. Mr. Gray had more aggravating factors than the lawyers in *Patty* and *Walwyn* and no mitigating factors. Moreover, unlike the lawyer in *Patty*, Mr. Gray has not been subjected to separate sanctions for any of his acts. Given Mr. Gray's multiple ethical violations and the presence of multiple aggravating factors, we conclude that the hearing panel's recommended sanction was supported by substantial and material evidence and neither arbitrary and capricious nor an abuse of discretion.

## IV. Conclusion

For the reasons discussed, we hold that the hearing panel's conclusions that Mr. Gray violated Tennessee Rules of Professional Conduct 1.3, 1.4, 1.15(d) and (e), 1.16, 4.1(a), and 8.4(c) are supported by substantial and material evidence, are neither arbitrary nor capricious, and are not an abuse of discretion. Although the hearing panel's reliance on ABA Standard 6.12 was improper, its other determinations related to Mr. Gray's punishment—including the recommended sanction—are supported by substantial and material evidence and are not arbitrary or capricious or an abuse of discretion. We therefore affirm the judgments of the hearing panel and the trial court. The costs of this appeal are taxed to Mr. Gray, for which execution may issue if necessary.

_____
SARAH K. CAMPBELL, JUSTICE